In re KROH BROTHERS DEVELOP-
MENT COMPANY, et al, Debtors.

The KROH OPERATING LIMITED
PARTNERSHIP, Plaintiff,

v.

BARNETT BANK OF SOUTHWEST
FLORIDA, et al, Defendants.

Bankruptcy No. 87–00640–1–11.
Adv. No. 88–0771–1–11.

United States Bankruptcy Court,
W.D. Missouri.

May 30, 1989.

See also, Bkrtcy., 100 B.R. 487.

Jonathan Margolies and Charles Fowler,
McDowell, Rice & Smith, Kansas City, Mo.,
for plaintiff.

Benjamin F. Mann, Blackwell, Sanders,
Matheny, Weary & Lombardi, Kansas City,
Mo., for defendants.

## ORDER

KAREN M. SEE, Bankruptcy Judge.

After careful review, the Court hereby
adopts and enters the attached proposed

Findings of Fact, Conclusions of Law and Judgment submitted by Barnett Bank of Tampa, the prevailing party at trial. The proposed Findings of Fact, Conclusions of Law and Judgment are based on oral Findings and Conclusions made on the record at the conclusion of trial.

IT IS SO ORDERED.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

This adversary action came before the Court on plaintiffs' complaint to avoid certain transfers, involving certificates of deposit (C.D.s) issued by defendant Barnett Bank of Tampa, N.A. ("BBT") to the debtor, Kroh Brothers Development Company ("KBDC"). Plaintiffs' complaint sought recovery not only from BBT but also from Barnett Bank of Southwest Florida ("BBSW") with respect to a transaction involving C.D. proceeds in the amount of $39,993.51. Prior to trial, plaintiffs effected a settlement regarding this one transaction, dismissing all claims as against BBSW and dismissing all claims arising out of this one transaction as against BBT. Thus, the claims tried before the Court involved only BBT as a defendant.

The plaintiffs herein are the debtor-in-possession, KBDC, and the debtor's designated § 1123(b) representative, The Kroh Operating Limited Partnership. Both KBDC and its designated representative will be referred to herein collectively as "KBDC."

Trial was held on May 17, 1989, at which time the parties stipulated to certain basic facts, both testimonial and documentary evidence was adduced, and argument made by counsel. Based on the foregoing, the Court makes the following findings and conclusions.

*Findings of Fact*

BBT and BBSW are separate, independent banks which are owned by the same holding company, Barnett Banks, Inc. In the early 1980s, KBDC established and maintained an ongoing banking relationship with both banks. In the summer of 1986, KBDC had a $1 million line of credit with BBT and another $1 million line of credit with BBSW. As a result of discussions among the two banks and KBDC, it was decided that KBDC would consolidate its two $1 million lines of credit into a single $2 million line of credit with BBSW.

The last in a series of renewals on BBT's $1 million line of credit was a promissory note dated June 13, 1986 with a stated maturity date of September 15, 1986. On or shortly after September 15, BBT billed KBDC for the interest which was due on this note for the period from June 13 to September 15. On October 15, 1986, pursuant to the agreement to consolidate the two $1 million lines of credit, BBSW wired $1,000,000 to BBT and BBT assigned its June 13, 1986 note to BBSW "without recourse." BBT then billed KBDC for the interest due for the period from September 15 to October 15. Representatives of BBT, BBSW and KBDC all understood and agreed that BBT had assigned its right to collect the $1,000,000 principal amount plus any future interest that might accrue to BBSW but specifically retained its right to collect payment for the interest which had accrued but was unpaid at the time of assignment.

On November 21, 1986, KBDC borrowed $285,000 from BBT and executed a note, security agreement and assignment, evidencing the loan and KBDC's pledge of its $300,000 C.D., which had been issued on November 5, 1986. This loan was a single term loan, with principal and interest payable in a lump sum upon the stated due date of February 19, 1987.

In addition to the $300,000 C.D., which had been originally issued in 1984 and rolled over at each maturity date, BBT held in its possession a $55,000 C.D., which was originally issued on November 15, 1985 and was automatically renewed thereafter. Both C.D.s were clearly legended as "non-negotiable." Both C.D.s also contained on their face two boxes: one described as "personal and non-transferable"; and the other described as "non-personal or transferable." In both instances, the latter box was checked.

BBT continued to periodically bill KBDC for interest for the period from June 13 to October 15, which totalled $28,849.31, and BBT's senior vice-president, Bruce Savage, had several telephone conversations with KBDC representatives during the fall and winter of 1986 in which he was assured that payment of this obligation would be forthcoming. On January 9, 1987, Mr. Savage wrote to KBDC, reminding it of the delinquent status of this interest obligation and requesting prompt payment of its so that it would not be necessary to use C.D. funds to satisfy this obligation.

In this same January 9 letter, Mr. Savage stated that, unless he was advised otherwise, he assumed KBDC intended to pay off its $285,000 debt by application of the C.D. proceeds upon its maturity on February 19, 1987. BBT received no response from KBDC and, on February 19, 1987, it setoff the $285,000 loan plus accrued interest thereon in the amount of $4,405.40 against the $300,000 C.D. and setoff the $28,849.31 interest obligation against the balance of the $300,000 C.D. and a portion of the $55,000 C.D., leaving a balance of $39,993.51. As previously noted, this $39,-993.51 has been separately resolved by the parties and was not in issue at trial.

BBT advised KBDC of its setoff by letter dated February 25, 1987. At both the time of the setoff (February 19) and its advice of same to KBDC (February 25), BBT was not aware that KBDC had filed its bankruptcy petition on February 13, 1987.

*Discussion and Conclusions of Law*

Plaintiff KBDC contends that BBT did not have the right to make the setoffs on February 19, 1987 because: (1) BBT was stayed by operation of 11 U.S.C. § 362 from exercising its rights of setoff; (2) the $28,849.31 interest obligation was not a valid debt owed by KBDC to BBT and thus could not serve as the basis of a setoff; and (3) the $285,000 was not matured on the date of bankruptcy. KBDC also contends that BBT did not have a valid, perfected security interest in the C.D.s and, therefore, cannot justify its application of the C.D. proceeds as liquidation of a security interest in collateral. Accordingly,

KBDC seeks recovery of the C.D. funds under §§ 362, 542, 544, 549 and 550 of the Bankruptcy Code. BBT rejects KBDC's contentions and asserts that, as of the date of bankruptcy, it had both rights of setoff and an enforceable security interest in the C.D.s. The Court will address each of KBDC's principal contentions.

1. Setoff
    a. *The Interest Obligation*

■ KBDC argues that BBT's assignment of its Line of Credit note to BBSW necessarily constituted, as a matter of law, the assignment of all rights and interests therein including any accrued but unpaid interest. However, the pertinent authorities indicate that:

> The question of what rights and remedies pass with a given assignment depends on the intent of the parties.

*Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1208 (9th Cir.1975), *cert. denied*, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976); Accord: *ACLI International Commodity Services, Inc. v. Banque Populaire Suisse*, 609 F.Supp. 434, 444 (S.D.N.Y.1984); *Northwest Oil & Refining Co. v. Honolulu Oil Corp.*, 195 F.Supp. 281, 286 (D.Mont. 1961).

The evidence adduced at trial clearly shows the parties' intent. They intended that the line of credit note, to the extent of $1,000,000, be assigned to BBSW; this is evidenced not only by BBT's internal memorandum and Mr. Savage's testimony, but also by the fact that BBSW paid only $1,000,000 to BBT, representing the unpaid principal only, not $1,028,849.31, representing both principal and interest. They intended that BBT retain the right to collect the $28,849.31; BBT billed and made written demand on KBDC for that amount and BBSW has not made any claim against KBDC for any interest prior to October 15, 1986.

■ KBDC also argues that BBT's retention of the claim is an impermissible splitting of a cause of action under Uniform Commercial Code ("UCC") Section 3–

202. This section expressly allows such "splitting" of a claim. When something less than the whole amount of the indebtedness represented by a note is assigned, it destroys the note's negotiability but does operate as a valid partial assignment. *See e.g., All American Finance Co. v. Pugh Shows, Inc.,* 30 Ohio St.3d 130, 507 N.E.2d 1134, 3 UCC Rep.Serv.2d 1421 (1987); *West v. Baker,* 109 Ariz. 415, 510 P.2d 731 (en banc 1973).

Accordingly, the Court concludes that BBT retained its right to collect the accrued interest for the period from June 13, 1986 to October 15, 1986 in the amount of $28,849.31. This obligation was clearly due and owing as of the date of bankruptcy and BBT had a valid right of setoff as of that date.

### b. *The $285,000 Loan Obligation*

■ There is no dispute that KBDC owed BBT $285,000 plus accrued interest as of the date of bankruptcy. KBDC contends, however, that because the stated maturity date of the note was six days after the date of bankruptcy, BBT did not have a right of setoff with respect to this unmatured debt on the date of bankruptcy. KBDC's contention is not supported by the language of § 553 of the Bankruptcy Code or its legislative history, and it is directly contrary to the great weight of judicial and treatise authority.

■ Section 553(a) clearly allows setoff of "a claim of such creditor against the debtor that arose before the commencement of the case." A "claim" is defined in § 101(4) of the Bankruptcy Code to include "liquidated, unliquidated, fixed, contingent, matured, unmatured ... debts." The $285,000 note obligation was incurred on November 21, 1986; obviously, it arose before the commencement of the case. Thus, regardless of its lack of maturity, the $285,000 note was clearly within the definition of debts which could be setoff under § 553(a). The legislative history on § 553 indicates that "bankruptcy operates as the acceleration of the principal amount of all claims against the debtor." H.R.Rep. No. 595, 95th Cong. 1st Sess. 353 (1977), U.S. Code Cong. & Admin.News 1978, 5787,

6309. Thus, debts which would otherwise be unmatured become matured upon the filing of the bankruptcy petition.

KBDC argues that such an interpretation gives no effect to the strong-arm clause of § 544 which gives the trustee or debtor in possession the powers of a hypothetical lien creditor on the date of bankruptcy. However, if KBDC's contention is given effect, it renders § 553(a) meaningless. The Court must strive to interpret §§ 544 and 553 in such a way as to give both provisions some effect. Certainly, allowing setoffs of debts which are unmatured as of the date of bankruptcy does not emasculate § 544(a) and it does give effect to § 553(a). Moreover, § 553(a) expressly states that the right of setoff is qualified only by §§ 362 and 363; it omits any reference to § 544.

Most significantly, this Court, quoting from the leading bankruptcy commentator, has specifically held that a bank may setoff against a customer's account a debt evidenced by a promissory note which was not yet due on the date of bankruptcy.

> It is patent law on the issue of setoff, however, that 'the right of setoff may be asserted in the bankruptcy case even though at the time the petition is filed one of the debts involved is *absolutely owing but not presently due*, or where a definite liability has accrued but is as yet unliquidated. Nor is it necessary that the debt sought to be setoff be due when the case is commenced.' 4 Collier on Bankruptcy para. 553.10(2), pp. 553–50 (1982). In this case, in which there can be no question about the existence of the debt, and the fact that it was 'absolutely owing,' albeit as yet unmatured, the bank's right of setoff must be regarded as manifestly present.

*Matter of Isis Foods, Inc.,* 24 B.R. 75, 76 (Bkcy.W.D.Mo.1982) (emphasis in original).

The rationale of Judge Stewart's ruling in *Isis Foods* has been adopted by numerous courts, including circuit courts, district courts and bankruptcy courts. *See Braniff Airways, Inc. v. Exxon Co., U.S.A.,* 814 F.2d 1030, 1036 (5th Cir.1987) (allowing setoff when "[t]he debt was absolutely owed;

it just was not due until a calculation of the amount of fuel that was used was made."); *In re Greseth,* 78 B.R. 936, 942 (D.Minn. 1987) (following *Matthieson, infra* ); *In re Parrish,* 75 B.R. 14, 16 (N.D.Tex.1987) (following *Matthieson, infra* ); *Matter of Matthieson,* 63 B.R. 56, 59 (D.Minn.1986) (quoting the above-quoted portion of the *Isis Foods* opinion); *Matter of Lundell Farms,* 86 B.R. 582, 585–87 (Bkcy.W.D.Wis.1988); *In re Brooks Farms,* 70 B.R. 368, 372 (Bkcy.E.D.Wis.1987); *In re Elsinore Shore Associates,* 67 B.R. 926, 936–46 (Bkcy.D.N. J.1986) (allowing a bank to setoff debtor's funds on deposit against the debtor's contingent and unliquidated obligation to reimburse the bank on open letters of credit); *In re Whitman,* 38 B.R. 395, 397 (Bkcy.D. N.D.1984); *Matter of Fred Sanders Co.,* 33 B.R. 310, 312 (Bkcy.E.D.Mich.1983); *In re Wilson,* 29 B.R. 54, 57 (Bkcy.W.D.Ark. 1982).

KBDC contends that this Court's ruling in *In re Amco Products, Inc.,* 17 B.R. 758 (Bkcy.W.D.Mo.1982), *rev'd,* 50 B.R. 723 (W.D.Mo.1983), is contrary to the *Isis Foods* holding. Although Judge Barker did discuss the issue of setoff against an unmatured debt, his decision denying setoff was based on the fact that the obligation did not arise, let alone mature, until after the date of bankruptcy:

> In the case at bar, the events that would entitle the Bank to dip into the reserve account occurred after the date of the Order of Relief in the case ...

17 B.R. 758, 765. Thus, *Amco Products* is distinguishable on this ground, alone. Furthermore, even if state law were determinative on the right of setoff as KBDC contends that *Amco Products* requires, Florida law clearly allows setoff prior to maturity if the note, as it does in this case, so provides. See *Aetna Casualty & Surety Co. v. Atlantic National Bank of West Palm Beach,* 430 F.2d 574, 577 (5th Cir. 1970).

More importantly, to the extent there is any inconsistency between the *Isis Foods* and *Amco Products* holdings, this Court, in a recent opinion by Judge Koger where he reviewed both decisions, concluded that the holding in *Isis Foods* that an unmatured but absolutely owed note debt could be setoff against a bank deposit was correct and held that the creditor could setoff funds it owed the debtor against the debtor's promissory note which had a stated maturity date of six years (as opposed to six days as in this case) after bankruptcy was filed. See *In re Lott,* 79 B.R. 869, 871–73 (Bkcy.W.D.Mo.1987).

The Court concludes here that the rationale of Judge Stewart in *Isis Foods* is controlling in this situation, and BBT is entitled to setoff the C.D.s against the $285,000 loan obligation which was absolutely due but six days shy of its stated maturity date when KBDC filed for bankruptcy.

#### c. *Automatic Stay*

Having concluded that BBT had the right of setoff on the date of bankruptcy with respect to both the $28,849.31 interest obligation and the $285,000 loan, the Court turns the question of whether BBT's failure to obtain relief from the automatic stay before exercising such rights of setoff should operate now to invalidate such setoff rights. Undoubtedly, BBT's setoff on February 19, 1987 constituted a technical violation of the automatic stay which took effect upon the filing of KBDC's bankruptcy petition six days earlier. However, the Court finds that such violation was an innocent one, done without knowledge that the bankruptcy had been filed and not done willfully or intentionally. BBT promptly advised KBDC of its setoff and there is not the slightest indication that KBDC was harmed in any way by such setoff.

In such circumstances, it makes little difference whether the Court declares the initial exercise invalid and then allows the creditor to re-exercise his right of setoff or the Court simply allows the initial setoff to stand notwithstanding the technical violation of the stay. Regardless whether a creditor has sought relief from the automatic stay, it is entitled to assert as an affirmative defense to a trustee's avoidance or turn over action its right of setoff. See *In re The Charter Co.,* 86 B.R. 280, 282–83 (Bkcy.M.D.Fla.1988).

In summary, the Court concludes that, as of the date of bankruptcy, BBT had a valid right of setoff with respect to both the interest obligation and the $285,000 loan, and BBT's exercise of that right of setoff against the C.D.s, although in technical violation of the automatic stay, is hereby recognized and accepted by the Court as a valid affirmative defense to KBDC's claim for recovery of the C.D. funds.

### 2. Security Interest

As noted above, the Court believes that this case can be fully resolved solely on the setoff issue. BBT was entitled to setoff the C.D.s and all of KBDC's claims fail. However, in the alternative, even if BBT did not have valid rights of setoff on the date of bankruptcy with respect to the C.D.'s, the Court concludes, based on the following, that BBT had a valid, perfected security interest in the C.D.s securing the payment of both the $28,849.31 interest debt and the $285,000 loan and it had the right to liquidate the C.D.s and apply the funds in satisfaction of the secured indebtedness.

■ KBDC argues that BBT failed to sufficiently prove a written security agreement and thus failed to establish a security interest in the C.D.s. The focus of KBDC's argument is on the fact that BBT's microfilm copy of the executed security agreement was not fully legible and, thus, BBT did not sufficiently prove up its existence. Florida law expressly allows banks to maintain records on microfilm and such microfilm records are to be given the same force and effect as originals. § 658.72 Florida Statutes, 1987. Although not all of the fine print was legible on the microfilm, Mr. Savage clearly testified that the form of agreement used was the same as the blank form provided for comparison purposes and he was able to make out all of the unique terms which were filled in on the form, including the execution by KBDC. Moreover, even if the separate security agreement did not exist, both the June 13, 1986 and November 21, 1986 promissory note specifically grant BBT a security interest in all funds of KBDC on deposit with BBT as security for the repayment of the obligations of the respective notes. In short, BBT established a valid security interest in the C.D.s.

■ KBDC's main attack on BBT's security interest is its claim that the C.D.s were "generable intangibles" under the UCC and perfection of a security interest in general intangibles can only be accomplished by a UCC filing. It is undisputed that there was no UCC filing in this case. BBT contends that the C.D.s are "instruments" within the meaning of UCC § 9–105 and its security interest was perfected by BBT's possession of the C.D.s. It is equally undisputed that the C.D.s were in BBT's possession at all pertinent times. Consequently, the question as to whether BBT's security interest in the C.D.s was perfected turns on whether the C.D.s are instruments under the UCC. The UCC provisions and case law authority relied on by BBT indicate that a certificate of deposit, even if non-negotiable, is an instrument. See UCC §§ 9–105(1)(i) and 3–104(3); *Smith v. Mark Twain National Bank*, 805 F.2d 278 (8th Cir.1986); *Citicorp USA, Inc. v. Southeast Bank, N.A.*, 718 F.2d 1030 (11th Cir.1983); *Republican Valley Bank v. Security State Bank*, 229 Neb. 339, 426 N.W.2d 529, 6 UCC Rep.Serv.2d 895 (1988); *General Electric Co. v. M & C Mfg., Inc.*, 283 Ark. 110, 671 S.W.2d 189, 38 UCC Rep.Serv. 1764 (1984); *First National Bank in Grand Prairie v. Lone Star Life, Inc.*, 524 S.W.2d 525 (Tex.App.1975).

Most importantly, the Florida Supreme Court has specifically held that a non-negotiable certificate of deposit is an instrument, albeit a non-negotiable instrument, within the meaning of § 679.105(1)(i) Florida Statutes (Florida's enactment of UCC § 9–105(1)(i)). See *Citizens National Bank of Orlando v. Bornstein*, 374 So.2d 6, 27 UCC Rep.Serv. 242 (Fla.1979) (at the time of this decision, the definition of instrument was codified as § 679.105(1)(g)). KBDC argues that the *Bornstein* holding applies only if the C.D. is "transferable" and contends that the C.D.s in issue are non-transferable.

**120**

The Court, although noting that at least one authority, *General Electric Co. v. M & C Mfg. Inc., supra,* has held that a non-negotiable and non-transferable C.D. is an instrument under § 9–105, need not decide whether a non-transferable C.D. is an instrument. In this case, the Court concludes that the C.D. is transferable, at least to some extent, and such limited transferability is sufficient to be an instrument. See *Bornstein, supra; In re Coral Petroleum, Inc.,* 50 B.R. 830, 837–38 (Bkcy.S.D. Tex.1985) (holding that a note with severe limitations on its transferability was still an "instrument."

KBDC's claim that these C.D.s are not transferable is premised on a strictly grammatical construction of the phrase "non-personal or transferable" so that it cannot be read to mean either one or the other or both. KBDC's expert witness' interpretation of this phrase to mean that a corporation can never have a transferable C.D., even if it is linguistically and grammatically correct, makes no common or business sense. The Court readily admits that the "transferable—non-transferable" language used on the C.D.'s is confusing, especially in light of the provisions of the Federal Reserve System's Regulation D referred to by KBDC's counsel. However, the evidence appears clear on the point that all parties concerned understood and treated these C.D.s as if they are transferable under some circumstances. Certainly, the caption on the reverse side of the C.D., which begins: "Notice to Assignee", compels the conclusion that the C.D. was intended to be assignable or transferable by delivery. This is the fundamental criterion under UCC § 9–105(1)(i) for determination of whether a particular document is an instrument.

Accordingly, the Court concludes that the C.D.s are "instruments" within the meaning of UCC § 9–105(1)(i) and, thus, BBT properly perfected its security interest in these instruments by taking and maintaining possession of them.

Therefore, assuming for purposes of this argument only that BBT did not have valid rights of setoff as against the C.D.s, the Court concludes that BBT held valid, perfected security interests in the C.D.s as security for repayment of both the $28,849.31 interest obligation and the $285,000 loan obligation. BBT was entitled to apply the proceeds of these C.D.s, upon maturity, in satisfaction of the secured debt and such application is a valid defense to all of KBDC's claims for recovery of the C.D. funds.

*Judgment*

Based on the foregoing, it is hereby ordered that:

1. Plaintiffs' claims asserted against defendant Barnett Bank of Tampa, N.A., arising out of or relating to certificate of deposit proceeds in the amount of $39,993.51 transferred to Barnett Bank of Southwest Florida, are dismissed, with prejudice, pursuant to the stipulation of the parties filed at the commencement of trial; and

2. Judgment is granted for defendant Barnett Bank of Tampa, N.A. on the remaining claims asserted against it in Counts I, II, III, IV, and V of plaintiffs' complaint.