**In re LATIN INVESTMENT
CORPORATION,
Debtor.**

**Murray DRABKIN, Trustee, Plaintiff,**

**v.**

**CAPITAL BANK, N.A., Defendant.**

**Bankruptcy No. 90–01046.
Adversary Proceeding No. 92–0278.**

United States Bankruptcy Court,
District of Columbia.

June 30, 1993.

Jose M. Ochoa, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for plaintiff.

Dwight D. Meier, Ginsburg, Feldman and Bress, Chtd., Washington, DC, for defendant.

### DECISION DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT

S. MARTIN TEEL, Jr., Bankruptcy Judge.

This adversary proceeding is an avoidance action. Resolving it involves determining how to perfect a security interest in a certificate of deposit (CD) bearing the legend "non-negotiable" and "non-transferable." Central to the dispute is how the CD should be classified under Article 9 of the Uniform Commercial Code ("UCC"). This is important because it controls the proper method of perfection. According to Murray Drabkin ("the trustee"), the trustee for the chapter 7 estate of the debtor, Latin Investment Corporation, the "non-transferable" legend renders the CD a "general intangible" and therefore perfection can occur only by filing a financing statement. Because no such filing occurred, the trustee wants to assert his strong arm powers under 11 U.S.C. § 544 and avoid the security interest. The holder

of the security interest, Capitol Bank, N.A. ("the bank"), classifies the CD as an "instrument" and asserts that its security interest was perfected by taking possession of the CD. The court finds a genuine issue of material fact—a lack of proof one way or the other—as to whether a CD bearing the legend "non-transferable" is customarily transferred by delivery in the ordinary course of business. Transfer of a writing in this manner is one of the requirements for an Article 9 instrument. Therefore, the parties' cross-motions for summary judgment will be denied.

### FACTS

In late 1988 and early 1989, the debtor, the bank, and Latin Credit Corporation entered into a arrangement for the financing of automobile loans from the bank to minority buyers. For purposes of this decision, it is necessary to know only that the debtor pledged the CD as security for Latin Credit Corporation's obligation to repurchase all defaulting automobile loans from the bank.

To effectuate the pledge, the bank issued the CD in the debtor's name in the amount of $200,000.00 after the debtor deposited $200,000.00 with the bank. The debtor and the bank then executed a hypothecation agreement giving the bank a security interest in the CD. Pursuant to the hypothecation agreement, the debtor delivered possession of the CD to the bank. Since then, the bank has continuously possessed the CD, but has not filed a financing statement covering the CD.

An involuntary chapter 7 petition was filed against the debtor on December 30, 1990. Exactly two years later, on December 30, 1992, the trustee filed the instant adversary proceeding against the bank. In his complaint, as amplified in his cross-motion for summary judgment, the trustee alleges that the bank failed to perfect its interest in the CD. Therefore, the trustee seeks to avoid the security interest in the CD by asserting his rights under § 544. In addition, pursuant to 11 U.S.C. § 549, the trustee wants to recover roughly $50,-000.00 the bank has allegedly charged

against the CD since the petition was filed. In its summary judgment motion, the bank counters that its security interest in the CD is, and always has been, perfected by possession.

## DISCUSSION

At issue is whether a writing purporting to be a CD but bearing on its face the legend "non-negotiable" and "non-transferable" is an "instrument" within the meaning of § 9–105(1)(i) of Article 9 of the Uniform Commercial Code (UCC).[1] If so, the bank's security interest is properly perfected by possession under UCC § 9–305. UCC §§ 9–302(1)(a), 9–304(1). If the security interest is properly perfected, the trustee has no occasion to use his strong arm powers under Code § 544(a)(1) to avoid the security interest by asserting the rights of a hypothetical lien creditor under UCC § 9–301(1)(b). Nor would the trustee have any reason for exercising his rights under § 549 of the Code. Two cases appear to support the bank's contention that the writing is an Article 9 instrument. *Jamison v. Society Nat'l Bank*, 66 Ohio St.3d 201, 611 N.E.2d 307 (1993) (CD bearing "non-transferable" and "non-negotiable" legend is Article 9 instrument); *General Elec. Co. v. M & C Mfg., Inc.*, 283 Ark. 110, 671 S.W.2d 189 (1984) (same).

If the writing is not an instrument, two other categories of collateral may apply. First, the writing may be a receipt evidencing a "deposit account" within the meaning of UCC § 9–105(1)(e) so that Article 9 does not apply to a security interest in the writing. UCC § 9–104(1); *Bank IV Topeka, N.A. v. Topeka Bank & Trust Co.*, 15 Kan.App.2d 341, 807 P.2d 686, 691 (1991); *Prudential–Bache Sec., Inc. v. Bartow County Bank*, 187 Ga.App. 530, 370 S.E.2d 751, 752 (1988). If that is the case, the transaction is controlled by the common law governing pledges. *Duncan Box & Lumber Co. v. Applied Energies, Inc.*, 165 W.Va. 473, 270 S.E.2d 140, 143 (1980); *Walton v. Piqua State Bank*, 204 Kan.

741, 466 P.2d 316, 326–27 (1970). Neither party espouses this position. Therefore, the court need not consider the proper application of the common law of pledge to a writing evidencing only a deposit account.

The other possibility is that the writing is a "general intangible" within the meaning of UCC § 9–106. If so, the bank could perfect its security interest only by filing a financing statement in accordance with UCC § 9–401. UCC § 9–302(1). This is the position taken by the trustee who points to the fact that no financing statement was filed as grounds for avoiding the bank's security interest in the writing.

An "instrument" is defined under Article 9 of the UCC as follows:

> "Instrument" means a negotiable instrument (defined in Section 3–104), or a security (defined in Section 8–102), or any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment.

UCC § 9–105(1)(i).

A "deposit account" is not actually defined in Article 9 but is described as follows:

> "Deposit account" means a demand, time, savings, passbook or like account maintained with a bank, savings and loan association, credit union or like organization, *other than an account evidenced by a certificate of deposit.*

UCC § 9–105(1)(e) (emphasis added).

"General intangibles" is described in Article 9 in the following manner:

> "General intangibles" means any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money.

UCC § 9–106. According to the Official Comment, this category is a "catch-all" intended to bring under Article 9 "miscellaneous types of contractual rights and other personal property which are used or may

---

**1.** All references to the "UCC" correspond to subtitle I of title 28 of the District of Columbia Code, which codifies the Uniform Commercial Code. All references to the "Code" correspond to the Bankruptcy Code.

become customarily used as commercial security." UCC § 9–106 cmt. Listed as examples are goodwill, literary rights and rights to performance, as well as copyrights, trademarks and patents (unless excluded by UCC § 9–104(a)). *Id.*

■ Because "general intangibles" constitutes a catch-all category of collateral, the initial inquiry should be whether the writing at issue here escapes that catch-all category by being a deposit account or an instrument. Both parties point to the definition of deposit account as excluding CD's and conclude that the writing cannot just evidence a deposit account. That observation, however, only begins the analysis since the way a writing is labelled is not dispositive of its proper characterization under Article 9. Inquiry must still be had whether the writing is in fact a CD under UCC § 9–105(1)(e). But first, the term "CD" as it is used in Article 9 must be defined.

■ Unfortunately, nowhere in Article 9 is "CD" defined. However, Article 3 provides a useful definition for a CD: "A writing [which constitutes] an acknowledgment by a bank of receipt of money with an engagement to repay it." UCC § 3–104(2)(c). This definition should control in Article 9. It merely recites the commonly accepted definition of a CD as it has been formulated in other contexts. *Compare* UCC § 3–104(2)(c) *with* 10 Am.Jur.2d *Banks* § 455, at 426 & n. 8 (1963) (citing cases); *Black's Law Dictionary* 286 (rev. 4th ed. 1968); Steven L. Harris, *Non–Negotiable Certificates of Deposit: An Article 9 Problem,* 29 U.C.L.A.L.Rev. 330, 330 & n. 2 (1981) (citing authority) [hereinafter Harris, *Non–Negotiable CD's*]; 5B Michie, *Banks and Banking* § 313 (1991); *see also* Harris, *Non–Negotiable CD's,* at 341–63 (Article 9 should govern nonnegotiable, nontransferable CD's). Absent a contrary definition applicable only to Article 9 or any reason for applying a different definition, the definition of CD as it is usually used in commerce (and in Article 3) should apply in Article 9. *Cf. McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337, 342–43, 111 S.Ct. 807, 811, 112 L.Ed.2d 866 (1991) (analyzing language of federal statute).

■ The instant writing, on its face, is "an acknowledgment by a bank of receipt of money with an engagement to repay it." The language "nonnegotiable" and "nontransferable" has no effect on the bank's promise to repay, but only restricts the ability to negotiate or otherwise transfer the CD. Therefore, the writing constitutes a CD under Article 9 rather than a receipt for a "deposit account" as that term is laid out in UCC § 9–105(1)(e). Accordingly, the bank's security interest in the writing is not excluded from Article 9 by § 9–104(*l*).

Having determined that the instant writing is a CD and therefore subject to Article 9, the next issue is whether it is an "instrument" as defined in UCC § 9–105(1)(i). If not, the writing must fall within the "general intangibles" catch-all category of collateral subject to Article 9 since no other category comes close to describing its contours.

Neither party contends that the writing on its face is an Article 3 negotiable instrument or an Article 8 security (although the bank contends the writing was later modified by the hypothecation agreement to become negotiable). In addition to Article 3 negotiable instruments and Article 8 securities, Article 9 instruments include the following:

> [A]ny other writing which [1] evidences a right to the payment of money and [2] is not itself a security agreement or lease and [3] is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment.

UCC § 9–105(1)(i). The first two requirements are met by the instant writing. Thus, the dispositive issue here is whether the writing "is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment."

■ The trustee, focusing on the legend "non-transferable," maintains that the writing cannot be transferred by delivery in the ordinary course of business. (The trustee concedes that the legend "non-ne-

gotiable" does not preclude the instant writing from being an Article 9 instrument.) Taking a different approach, the bank contends that what distinguishes a writing as an Article 9 instrument is the concept of "presentment." According to the bank, the transferability requirement is satisfied where a writing must be presented for payment.

The court believes that the trustee is incorrect in his analysis. The language "of a type which is in ordinary course of business" indicates that the realities of the marketplace should control. The authorities the trustee relies on ignore this language. Instead, they take the particular writing before them at face value. They assume, without any basis for knowing the realities of the marketplace, that a CD labelled "nontransferable" simply cannot be transferred. *See* Barkley Clark, *The Law of Secured Transactions Under the Uniform Commercial Code* ¶ 7.09[2] (2d ed. 1988); *Bank IV Topeka*, 807 P.2d at 691; *Prudential–Bache*, 370 S.E.2d at 752.

In *Bank IV Topeka, N.A. v. Topeka Bank & Trust Co.* the court did acknowledge that whether a particular writing is an Article 9 instrument depends on the " 'current usage of the marketplace' " and "whether professionals who deal with the writing attach importance to its possession." 807 P.2d at 691 (quoting *In re Coral Petroleum, Inc.*, 50 B.R. 830, 838 (Bankr.S.D.Tex.1985)). However, the court refused to apply this test to the writing before it, explaining—

> We have no indication in this record that would aid us in concluding what professionals in the marketplace might make of the document before us. However, it is our opinion that, given careful thought, most professionals would not desire to trade in an instrument that is marked "nontransferable."

*Id.*

This quotation reveals two analytical errors. First, the court based its decision on an incomplete record instead of remanding to the trial court for inquiry into the ordinary course of business as required by UCC § 9–105(1)(i). (There is no indication

the court was resting its decision on the failure of Topeka Bank & Trust Co., which claimed the writing was an Article 9 instrument, to meet its burden of persuasion).

Second, the court equated the requirement of UCC § 9–105(1)(i) that the writing be transferred by delivery in the ordinary course of business with a requirement that it be "traded by professionals in the marketplace." The latter, however, is not the correct standard. Even an Article 8 security is not required to meet such a fluid level of transferability. *See* UCC 8–102(1)(a)(ii). Rather, the standard should be the lesser one stated in the Article 9 definition of instrument.

Finally, it is worth noting that the court in *Bank IV Topeka* was construing a writing labelled a CD but which stated on its face that "[t]his certifies that the Account Holder holds a savings account" with the bank. 807 P.2d at 687. Given this language, it was not unreasonable for the court ultimately to conclude that the "CD" merely evidenced a deposit account as described in UCC § 9–105(1)(e). *Id.* at 691.

This court believes that the test for transferability should be whether a particular type of writing customarily is transferred by delivery in the ordinary course of business. There is no basis in UCC § 9–105(1)(i) for allowing the legend on a writing to control its transferability. Instead, that section requires that actual business practices be consulted. 1 Grant Gilmore, *Security Interests in Personal Property* § 12.5, at 377 (1965) [hereinafter Gilmore, *Security Interests* ].

■ Moreover, if the business world regularly transfers writings bearing the legend "non-transferable," the court should give that practice legal effect unless doing so is inconsistent with the UCC. The UCC is not intended to thwart usual business practices but to effectuate them. UCC § 1–102(2)(b) & cmt. 1; *Nanakuli Paving & Rock Co. v. Shell Oil Co.*, 664 F.2d 772, 790 (9th Cir.1981); *In re United Thrift Stores, Inc.*, 363 F.2d 11, 14 (3d Cir.1966). Thus, the realities of business practice should control whether a particular writing meets the standard for transferability

found in UCC § 9–105(1)(i). This is the approach advocated by the better reasoned authority. *See In re Kroh Bros. Dev. Co.,* 101 B.R. 114, 120 (Bankr.W.D.Mo.1989); *In re Coral Petroleum, Inc.,* 50 B.R. 830, 838 (Bankr.S.D.Tex.1985); *Army Nat'l Bank v. Equity Developers, Inc.,* 245 Kan. 3, 774 P.2d 919, 926 (1989); Harris, *Non–Negotiable CD's,* 29 U.C.L.A.L.Rev. at 371–75; *see also* 1 Gilmore, *Security Interests* §§ 12.5–12.6.

■ When the bank argues for a bright line test where any CD that must be presented for payment is an instrument, it misperceives the function of the transferability requirement. For the transferability requirement of UCC § 9–105(1)(i) is intended to ensure that before qualifying as an instrument, a writing is dealt with as though negotiable—that is, as though generally recognized as embodying the underlying property and, more importantly, in consequence of that, generally recognized as being transferred by delivery in the ordinary course of business. *See* UCC § 9–106 cmt. This is important if possession of the writing, or the debtor's lack of possession, is to be deemed to be notice to the world that the underlying property is encumbered.

The bank argues that where a writing (the CD) must be presented in order to receive payment, the writing can safely be said to embody the underlying property (the chose in action against the bank). In these circumstances, as long as a lender ("the first lender") takes possession of the writing, the bank contends, there is no danger of another lender ("the second lender") making a loan based on the underlying property. There is no such danger, the bank reasons, because the second lender will want possession of the writing before it will advance any monies.

What the bank fails to consider is that the second lender may not recognize that access to the underlying property is tied up in a writing. (This concern is especially viable where the underlying property is intangible, as it is here.) If this is the case, the second lender will not recognize the significance of the debtor's lack of posses-

sion of the writing. Thus, despite the existence of an "indispensable" writing, the debtor may produce some other evidence of the existence, and ownership, of the underlying property and thereby induce the second lender to advance a loan. Unless the second lender has some basis for knowing that the underlying property is tied up in the writing, the debtor's lack of the writing cannot be deemed to be notice that the underlying property is encumbered. *First Sav. Bank of Virginia v. Barclays Bank, S.A.,* 618 A.2d 134, 139 (D.C.1992)

As was explained in *Barclays Bank:*
[P]erfection by possession is permitted only where it is *widely recognized* that the underlying property which is of value, whether corporeal or intangible, is conceptually entirely embodied in the written item in question, so that the possession of the paper can be fairly deemed to be possession of the actual property insofar as notice to third parties is concerned.

618 A.2d at 138 (emphasis added). Where presentment of a writing is required in order to exercise the rights inherent in the underlying property, it is safe say to that the writing embodies the property. However, that attribute of the writing does not in itself indicate that taking possession of the writing is an appropriate means of perfection. It must also be widely recognized that the underlying property is customarily embodied in some indispensable writing. Only then is it appropriate to deem possession of the writing "to be possession of the actual property insofar as notice to third parties is concerned." *Id.*

Wide recognition that the underlying property is embodied in an indispensable writing will exist when that writing has come to be transferred by delivery in the ordinary course of business. At this point in the writing's evolution, the marketplace attaches importance to possession of the writing as a token of the rights it represents, transferring the writing by delivery as a means of transferring the underlying property in the ordinary course of business. 1 Gilmore, *Security Interests* § 12.5, at 381. In other words, the writing is dealt

with as if negotiable. When this is the case, the debtor's lack of possession of the writing should alert third-parties that the underlying property is encumbered.

Reading the Article 9 definition of instrument as requiring only that the writing be of a type customarily presented for payment makes the definition too open-ended. Such a reading would obliterate the distinction between "instruments" and those kinds of collateral, such as "accounts" (see UCC § 9–106) and certain "general intangibles," evidenced by a writing but in which a security interest is not appropriately perfected by possession. Perfection by taking possession of the latter writings is inappropriate because the writings have not come to be recognized as embodying the underlying property (and therefore are not transferred by delivery in the ordinary course of business.) *See* UCC § 9–106 cmt.; UCC § 9–105 cmt. 3; 1 Gilmore, *Security Interests* § 12.5, at 381, 386–87. That their proper presentment will result in the transfer of the underlying property would not alone qualify them as instruments. An instrument is distinguished from a writing evidencing a general intangible in that an instrument is "either negotiable or to a greater or less extent dealt with as if negotiable," while the other writing is not. UCC § 9–106 cmt. In keeping with this distinction, the definition of instrument is open-ended to include writings as they come to be transferred in commercial practice as though they represent rights in the underlying property. 1 Gilmore, *Security Interests* § 12.5, at 377, 381, 386.

The bank, focusing on the use of the word "type" in the Article 9 definition of instrument, argues that custom and usage in the marketplace with respect to a particular writing need not be consulted in determining whether the writing is transferable. Thus, the bank maintains that "type" should not be construed "narrowly to refer only to writings of exactly the same character, such as, in this case, other [nontransferable CD's]," but "broadly to include any writing which, like a stock certificate or negotiable instrument, is treated as a token of the rights it represents and, therefore, is normally delivered to any person to whom the rights are transferred." *First Nat'l Bank in Grand Prairie v. Lone Star Life Ins. Co.*, 524 S.W.2d 525, 533–34 (Tex.Ct. App.), *writ ref'd n.r.e.*, 529 S.W.2d 67 (Tex. 1975). The bank notes that the writing embodies the underlying property in that it must be presented for payment. This "type" of writing, the bank concludes, is the type of writing that is normally transferred by delivery.

In *Lone Star Life* the court held that a CD bearing the legend "non-negotiable" (but not the legend "non-transferable") was an Article 9 instrument. 524 S.W.2d at 530. In a motion for rehearing, the appellant argued that a new trial was necessary because there was no evidence that a non-negotiable CD was transferred by delivery in the ordinary course of business. *Id.* at 533. The court rejected the notion that actual business practices need be considered in determining whether a writing is transferable. Instead, it adopted the broad construction of the transferability requirement quoted above. Applying that construction, the court concluded that as a matter of law the non-negotiable CD was an instrument. *Id.* at 534.

*Lone Star Life* can be distinguished from this case because there the court was dealing with only a non-negotiable CD, not a CD labelled "non-transferable" as well. A non-negotiable CD is widely recognized as embodying the underlying property and as being transferable. In fact, Article 3 specifically brings such writings within its ambit—which deals exclusively with instruments—but with the limitation that "there can be no holder in due course of such [writings]." *See* UCC § 3–805. In its original decision and again in its denial of rehearing, the *Lone Star Life* court emphasized that nothing in the CD prevented its assignment or transfer. 524 S.W.2d at 530, 534. Thus, the court cannot be faulted for dispensing with the taking of additional evidence.

But where the relationship of underlying property to a related writing is not so notorious, the taking of evidence as to business practices is the only fair way to determine whether a writing is transferable. To the

extent *Lone Star Life* holds otherwise, this court respectfully disagrees. In interpreting the transferability requirement broadly, the *Lone Star Life* court focused on the "uncertainty and confusion" a lender would face in determining how to perfect its security interest if business practices controlled whether a writing evidencing a right to the payment of money was transferable and therefore an instrument. 524 S.W.2d at 533. Because of this, the court sought to achieve "simplicity and clarity" by holding as a matter of law that a non-negotiable CD is an Article 9 instrument. *Id.*

What the *Lone Star Life* court failed to appreciate is that the parties whose interests are really at risk are innocent third-parties, not the initial lender. The lender can always protect itself by taking possession of the writing and by filing a financing statement; third-parties have no such means of protection. If the court had focused on the interests of third-parties, it would not have construed the transferability requirement so broadly. While the court did note that "[p]ossession of such a certificate can normally be expected to give the issuer and others notice that the possessor claims some interests in the rights which it represents," 524 S.W.2d at 534, it never made the more pertinent inquiry whether *the debtor's lack of possession* gives adequate notice that the underlying property is encumbered. Had the court made this inquiry, it would have realized the importance of consulting business practices as a way of assessing the adequacy of notice.

This court believes that the better view is that custom and usage in the marketplace should control whether the transferability requirement has been met.[2] 1 Gilmore, *Security Interests* § 12.7, at 390; Harris, *Non–Negotiable CD's*, 29 U.C.L.A. at 373–75. The court acknowledges that this view

introduces an element of uncertainty into the classification of novel types of writings and into the perfection of security interests in them. But—

> The dividing line between instruments and pure intangibles—between writings, that is, which are and which are not "transferable by delivery"—appears to be a relatively stable one. Mutations do occur, and when they do they always move in one direction: intangibles become instruments, more or less negotiable. The mutations are infrequent and the market-place evidence that one has occurred usually becomes overwhelming in a short period of time. It seems unlikely that this theoretical problem will ever become a real source of trouble.

1 Gilmore, *Security Interests* § 12.7, at 386. When faced with a novel writing, a prudent lender has ample means of protecting itself by perfecting both by possession and by filing. Accordingly, the court holds that for the transferability requirement to be met, it must be shown that a writing of a particular type, in this case, a CD bearing the legend "nontransferable," is generally recognized as being transferred by delivery in the ordinary course of business. In this respect, the court notes that the transferability requirement is satisfied where a particular type of writing is customarily transferred by a specific procedure for accomplishing delivery. *Coral Petroleum*, 50 B.R. at 838; *see also id.* at 833 (quoting procedure for transfer set forth in writing). The restrictive nature of such procedures does not defeat the writing's status of being an instrument. *Kroh Bros.*, 101 B.R. at 120; *Army Nat'l Bank*, 774 P.2d at 926.

In this case, there is insufficient evidence in the record to conclude as a matter of indisputable fact that the instant CD is customarily transferred by delivery in the ordinary course of business.[3] The

---

2. At oral argument, the bank contended that the transferability requirement need not be assessed in terms of transferability to third-parties. Instead, the bank urged that presentment itself amounts to transfer by delivery in the ordinary course of business. The court must reject this argument. The concept of transferability is distinct from that of presentment and more akin to

the concept of negotiability. As is discussed above, that a writing must be presented for payment does not, in itself, ensure that the writing is dealt with as if negotiable.

3. At least one commentator, after surveying commercial lenders, has concluded that non-negotiable CD's (including "non-transferable"

parties have not focused on this issue in their briefs. The affidavit of Manuel A. Sanchez, a vice president of Capital Bank, N.A., establishes the bank's practice of allowing transfer by delivery of the type of certificate of deposit at issue here but fails to establish that there is wide recognition of the transferability by delivery of such a writing. He states that "Capital, like many banks" marks certificates of deposits as "non-transferable" and "non-negotiable," but this falls short of establishing that transferability by delivery is a widely recognized practice. Therefore, this factual issue remains to be determined at trial or on further motion for summary judgment.

The bank's remaining argument that the CD was rendered negotiable and transferable by the execution of the hypothecation agreement must be rejected. Assuming that the CD is not otherwise transferable, the net result of the bank's argument would be to render the CD in this case an Article 9 instrument where before the CD had been a general intangible. In effect the bank would be altering the character of the writing without any mechanism for revealing the alteration. The bank could then perfect by taking possession of the CD, instead of by filing a financing statement (as would be required if the CD were a general intangible). This would allow the existence of a secret lien in direct contravention of the purposes underlying the process of perfection. *Barclays Bank*, 618 A.2d at 138.

Moreover, there is no basis in UCC § 3–119(1), relied on by the bank, for modifying the CD. That section applies only between the immediate parties to a transaction. *Cf. Leininger v. Anderson*, 255 N.W.2d 22, 31–32 (Minn.1977) (financing bank not bound by sales agreement executed by buyer and seller). As a hypothetical

lien creditor, the trustee is a stranger to the transaction who is not bound by the separate writing. *In re Kitchin Equip. Co. of Virginia, Inc.*, 960 F.2d 1242, 1245 (4th Cir.1992); *Faircloth v. Paul (In re International Gold Bullion Exch., Inc.)*, 60 B.R. 261, 264 (Bankr.S.D.Fla.1986). In any event, "[w]hether an instrument is negotiable is a question of law to be determined solely from the face of the instrument, without reference to the intent of the parties." *Cooperative Centrale Raiffeisen–Boerenleenbank B.A. v. Bailey*, 710 F.Supp. 737, 738 (C.D.Cal.1989) (citation omitted). The instant CD, on its face, is clearly not negotiable. *See* UCC § 3–104(a)(1).

Finally, that a separate agreement has been executed rendering an otherwise non-transferable writing transferable in some limited fashion only begins the UCC § 9–105(1)(i) transferability analysis. There still remains the crucial inquiry whether the writing is in fact customarily transferred by delivery in the ordinary course of business. Accordingly, the court holds that the hypothecation agreement did not render the instant CD negotiable, nor did it by itself cause the transferability requirement to be satisfied.

## CONCLUSION

Based on the foregoing, it is

ORDERED that the bank's motion for summary judgment is denied; it is further

ORDERED that the trustee's cross-motion for summary judgment is denied; and it is further

ORDERED that a status conference will be held on July 11, 1993 at 9:30 a.m. to discuss further proceedings in this case.

CD's) are transferable. Harris, *Non–Negotiable CD's*, 29 U.C.L.A.L.Rev. at 374–75; *see also id.* at 355 (expressly including "non-transferable" CD's among CD's that are the subject of the article). In addition, Federal Reserve Regulation D, governing reserve requirements for banks, allows a CD bearing the legend "non-transferable" to be transferred on a bank's books and also pledged without losing its non-transferable status. 12

C.F.R. § 204.2(f)(1)(iv). The very existence of this regulation suggests that "non-transferable" CD's are in fact transferred. Nonetheless, the plaintiff did not present this as evidence and the court believes the trustee should be given the chance to show that "non-transferable" CD's are not customarily transferred by delivery in the ordinary course of business.