**FIRST SAVINGS BANK of VIRGINIA, Appellant,**

v.

**BARCLAYS BANK, S.A., Appellee.**

**WATERGATE WEST, INC., Appellant,**

v.

**BARCLAYS BANK, S.A., Appellee.**

**Nos. 90–CV–951, 90–CV–1049.**

District of Columbia Court of Appeals.

Argued Oct. 2, 1991.
Decided Dec. 18, 1992.

Paul A. Kaplan, Washington, DC, with whom Richard E. Henning, Jr., Fairfax, VA, was on the brief, for First Sav. Bank of Virginia.

Geoffrey Judd Vitt, with whom Julie W. Davis and Eileen M. Mallon, Washington, DC, were on the brief, for Barclays Bank, S.A.

Frederic W. Schwartz, Jr., Washington, DC, for Watergate West, Inc.

Before STEADMAN and WAGNER, Associate Judges, and PRYOR, Senior Judge.

STEADMAN, Associate Judge:

This appeal involves competing claims of unpaid creditors to the interest of Basil and Laura Tsakos in a cooperative apartment located in the Watergate West apartment complex. Appellant First Savings Bank of Virginia ("First Savings") asserts a security interest in the apartment arising by virtue of a November 20, 1985 loan to the Tsakos for which they executed an agreement "pledging" their interest in the proprietary lease as collateral and giving First Savings possession of the proprietary lease document. Appellee Barclays Bank, S.A., ("Barclays") asserts a lien interest in the apartment based on a prejudgment attachment of the apartment on May 19, 1986 that was reduced to judgment on April 27, 1989. The trial court concluded that Barclays' lien took priority because First Savings failed to perfect its security interest in the apartment.

Appellant Watergate West, Inc. ("Watergate West"), the cooperative corporation that owns the building in which the Tsakos apartment is located, intervened in the trial court. On appeal, Watergate West challenges the validity of the prejudgment attachment and the denial of sanctions against Barclays for an alleged discovery violation. Watergate West also supports First Savings' position on the priority issue.

We affirm.

I

On December 8, 1981, the Tsakos became through assignment the owners of a ninety-nine year "Proprietary Lease and Occupancy Agreement" for Unit 602 in the Wa-

tergate West complex in the District of Columbia[1] and as a consequence thereof also became "members" in Watergate West, Inc. ("Watergate West"), a Delaware corporation, the cooperative entity which had executed the document.[2] Subsequently, in December 1984 and February 1985, Mr. and Mrs. Tsakos executed separate guarantees for a loan of 2.5 million Swiss francs by Barclays to the Tsakos' son Alexandre. Alexandre Tsakos defaulted on the loan, and Barclays brought actions on the guaranty in France and Switzerland as well as the District of Columbia.

Barclays commenced its action against the Tsakos in the District of Columbia on April 22, 1986, averring that the Tsakos were attempting to sell their cooperative apartment as part of their efforts to move their assets beyond the reach of Barclays, and obtained a prejudgment attachment pursuant to D.C.Code §§ 16–501, –533 (1989).[3] On November 10, 1987, a court in Paris rendered a judgment in favor of Barclays against the Tsakos for the then equivalent of approximately $2.5 million. On this basis, Barclays subsequently sought a judgment of condemnation here of the Tsakos' Watergate apartment. *See id.* § 16–524.

It was at this point that appellant First Savings sought involvement in this litigation. On December 1, 1988, First Savings moved to intervene in Barclays' suit against the Tsakos, claiming that it had perfected a security interest in the Tsakos' apartment by taking possession of the Tsa-

kos' proprietary lease document no later than December 12, 1985. The trial court granted First Savings' motion to intervene for the limited purpose of participating in any proceedings involving the validity and priority of liens against the apartment and for the disposition of the property. On April 27, 1989, the trial court ordered that the French judgment be enforced in this jurisdiction, gave judgment for Barclays for approximately $1.6 million,[4] and entered an order of condemnation of the Tsakos' apartment.

On May 30, 1989, three years after Barclays had first obtained a prejudgment attachment on the Tsakos' apartment, appellant Watergate West, Inc. filed a motion to intervene, for a stay, for reconsideration of the trial court's April 27, 1989 order, and for damages for wrongful attachment. In its motion, Watergate West asserted that Barclays' writ of attachment wrongfully attempted to attach the Tsakos' apartment, which was real estate owned by Watergate West, rather than the Tsakos' interest in the apartment. The trial court permitted Watergate West to intervene to participate in proceedings involving liens against the property attached and its disposition, but concluded that the request for other relief was untimely because the May 19, 1986 writ of attachment ordered Watergate West to hold all property in its control belonging to the Tsakos, thereby giving Watergate West adequate opportunity to identify the subject of the writ.[5] Finally,

---

1. A similar agreement covered a garage space. We refer to the two documents collectively as the "proprietary lease document," in order to be clear when we are speaking of the physical pieces of paper that create the abstract rights of the cooperative leasehold and membership.

2. Under the articles of incorporation, Watergate West, Inc., did not issue stock but instead had members, who were the "persons entering into and becoming owners of Proprietary Lease and Occupancy Agreements with the corporation."

3. A dismissal of this action on forum non conveniens grounds was reversed by this court in a prior appeal. *Barclays Bank, S.A. v. Tsakos,* 543 A.2d 802 (D.C.1988). On remand, the trial court stayed the action pending the outcome of the foreign litigation.

4. Barclays had been able to recover a portion of the French judgment from the Tsakos' French assets. The trial court's order reflected the outstanding amount of the Tsakos' judgment indebtedness. Barclays has represented to the trial court and this court that *it will notify the court should it recover additional amounts from the Tsakos' foreign assets.*

5. The trial court's ruling also rested in part on the circumstances surrounding Watergate West's intervention in the litigation during the prior appeal. See note 3 *supra.* This court granted Watergate West's motion to intervene, but Watergate West subsequently moved to strike its intervention, explaining that it had located a renter for the apartment for the duration of the appeal and therefore that it "no longer has a basis to request relief from this

on June 15, 1990, the trial court also denied First Savings' motion for partial summary judgment, ruling that Barclays' lien had priority over First Savings' unperfected security interest. It ordered that "Barclays is authorized to take all steps necessary to recover $1,620,138.10[6] through the sale of the interest of Basil and Laura Tsakos in Unit 602." Both First Savings and Watergate West appeal.[7]

## II

We turn to a determination of the relative priorities of First Savings' security interest and Barclays' lien in the Tsakos' cooperative apartment interest.

## A

Although cooperative apartments can take a variety of forms, the most common form is corporate, with the corporation owning the fee to the real estate and individual cooperative members holding shares of stock in the corporation and receiving long-term leases from the corporation to their individual apartments.

> A co-operative corporation is not a business corporation in the ordinary contemplation. It is a vehicle for the common ownership of property, to enable the occupants, the stockholders of the cooperative, to own, manage, and operate residential apartments without anyone profiting therefrom. The cooperative plan is *sui generis:* there are elements of ownership, as well as stock and leasehold rights. The primary interest of every stockholder in such a corporation is the long term proprietary lease and the stock is incidental to such purpose and affords merely the practical means of combining an ownership interest with the method of sharing proportionately the assessments for maintenance and taxes. While it is true that the occupants pay monthly maintenance charges in much the same manner as tenants pay rent, they have a substantial capital investment and a direct interest in the financial stability, character, reputation, and personal conduct of the other stockholders-occupants of the premises....

15A AM.JUR.2D *Condominiums and Co-operative Apartments* § 62, at 894 (1976). Watergate West, Inc. differs from the typical corporate cooperative described above in that the corporation's members do not own shares in the corporation. Rather, their membership rights are derivative of their proprietary leases, with members receiving one vote in the management in the corporation for every $100 or fraction thereof of the initial assigned mortgage value of their apartment as stated in the proprietary lease document. No separate document is issued evidencing the membership status.

As we recognized some years ago, "cooperative associations are, in a sense, legal hybrids, and [ ] disputes arising from the conduct of their affairs often present analytical difficulties." *Clydesdale, Inc. v.*

---

court." In these circumstances, we think the trial court did not abuse its discretion in rejecting as untimely Watergate West's subsequent attempt on a motion for reconsideration to challenge the validity of the attachment. The record shows that Watergate West's Executive Board understood that Barclays had attached the Tsakos' interest in their apartment, and, as lessor, Watergate West had no particular interest in the validity *vel non* of the attachment of nothing more than the Tsakos' interests in the cooperative apartment. D.C.Code § 16–523 (1989) deals with claims to the property, not challenges to the attachment process itself.

First Savings' sole challenge to the validity of Barclays' attachment is that it attempted to seize the bricks and mortar of the cooperative apartment rather than the Tsakos' interest in it. We think this assertion is baseless. Barclays has never attempted to seize or assert an interest in anything other than the Tsakos' interest in the cooperative apartment, and it could not reasonably be understood otherwise.

6. See note 4 *supra.*

7. We base our jurisdiction on D.C.Code § 11–721(a)(2)(C) (1989). Watergate West raises only three issues on appeal. We reject its challenge to the validity of the attachment for the reasons set forth in footnote 5 supra. Moreover, we fail to see how it has any standing to assert the priority of First Savings' security interest over Barclays' lien. *See Briggs v. United States,* 597 A.2d 370 (D.C.1991) (only a party aggrieved by an order or judgment may appeal as of right). Its challenge to the discretionary action of the trial court in denying its motion for discovery sanctions against Barclays is meritless.

*Wegener,* 372 A.2d 1013, 1015 (D.C.1977). Some of these analytical difficulties may be faced by lenders who are concerned with obtaining a security interest in a cooperative apartment.[8] We have no occasion to survey the full gamut of such difficulties, because First Savings' claim to priority as argued to us is based solely on the proposition that it properly perfected its security interest through its possession of the proprietary lease document as a pledgee of personalty.

**B**

We therefore postulate, without deciding, that the Tsakos' interest in the cooperative apartment is personal property subject to the strictures of the Uniform Commercial Code ("UCC" or "Code"), codified here as D.C.Code §§ 28:1–101 *et seq.* (1991).[9] Under the UCC, with an exception not pertinent here, an unperfected security interest is subordinate to the rights of a person who becomes a lien creditor before the security interest is perfected. D.C.Code § 28:9–301(1)(b) (1991). Since First Savings did not file a financing statement, *see* D.C.Code § 28:9–302 (1991), its priority over Barclays depends on whether a security interest in a borrower's right to a cooperative apartment can be perfected by possession of a document evidencing that right.

Perfection by possession is a possibility under the Code only with respect to "letters of credit and advices of credit (section 28:5–116(2)(a)), goods, instruments, money, negotiable documents or chattel paper." D.C.Code § 28:9–305 (1991). First Savings

argues that the proprietary lease document is an "instrument" for purposes of perfection by possession by relying on the Code's definition of "instrument" as encompassing a "security." D.C.Code § 28:9–105(1)(i) (1991). We think this argument is untenable.

The term "security" is defined by the Code in Article 8, the Code section dealing with the issuance, purchase and registration of investment securities, most notably stocks and bonds:

A "security" is an instrument which

(i) is issued in bearer or registered form; and

(ii) is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

(iii) is either one of a class or series or by its terms is divisible into a class or series of instruments; and

(iv) evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer.

D.C.Code § 28:8–102(1)(a) (1991).[10] We see no sound basis for concluding that a proprietary lease document is the functional equivalent of a stock certificate or government or corporate bond "commonly recognized ... as a medium for investment." D.C.Code § 28:8–102(1)(a) (1991). Cooperative apartments, especially where, as here, they must be occupied by the owner or subtenants approved by the cooperative board and may be transferred only to persons approved by the board, are not readily

---

**8.** This subject has had a long history in New York, a major center for the cooperative form of apartment ownership, which culminated in the passage by the legislature of a statute specifically covering the perfection of such liens. N.Y.U.C.C. §§ 9–104(j), –304(7) (McKinney 1990). The development of New York law with respect to such loans is set forth in detail in 2 PATRICK J. ROHAN AND MELVIN A. RESKIN, COOPERATIVE HOUSING LAW AND PRACTICE (MB) §§ 5A.01 et seq. (1989).

**9.** Article 9 of the Code has a provision excluding from its operation "the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder." § 28:9–104(j). *See*

*also* § 28:9–105(i). If this provision were deemed applicable to the First Savings transaction, priority would depend upon filing in the real property records, to which leaseholds are subject. *See Clay Properties, Inc. v. Washington Post,* 604 A.2d 890, 894 n. 13 (D.C.1992) (en banc). Thus, First Savings' suggestion is misplaced that if the UCC is deemed inapplicable to this transaction, we should explore common-law rules of personal property priorities.

**10.** D.C.Code § 28:9–105(1)(i) (1991), which contains the UCC's definition of "instrument," specifically incorporates the definition of "security" in D.C.Code § 28:8–102(1)(a) (1991).

perceived as the sort of marketplace, readily transferable medium for investment that Article 8's provisions contemplate and which, by Article 8's own terms, are deemed "negotiable instruments." D.C.Code § 28:8–105(1) (1991); *cf. United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 851, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975) (shares of cooperative stock not "securities" under 1933 and 1934 federal securities laws, as "[c]ommon sense suggests that people who intend to acquire only a residential apartment in a ... cooperative, for their personal use, are not likely to believe that in reality they are purchasing investment securities simply because the transaction is evidenced by something called a share of stock").

## C

Furthermore, the underlying principles of the Code would not be well-served by allowing perfection merely through possession of the proprietary lease document. "The antagonism to the 'secret lien' runs through our law of sales and security transactions alike." 1 GRANT GILMORE, SECURITY INTERESTS IN PERSONAL PROPERTY § 14.1, at 439 (1965). Hence, basic to the law of secured transactions is the principle that "the secured creditor must do something to give effective public notice of his interest." *Id.* at 438; *see also id.* at 463; 2 JAMES J. WHITE AND ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 24–12, at 348 (3d ed.1988); *Superior Financial Corp. v. Haskell*, 556 F.Supp. 199, 201 (S.D.N.Y. 1983). This principle is one that has "shaped the law of security interests in personal property for four hundred years: A party who wishes to acquire or retain a nonpossessory interest in property that is effective against others must, as a general matter, make it possible for others to discover that interest." Douglas G. Baird and Thomas H. Jackson, *Possession and Ownership: An Examination of the Scope of Article 9*, 35 STAN.L.REV. 175, 178 (1983).

In both real and personal property law, the law has attempted to assure that persons dealing with a property owner know when that property is subject to the lien claim of a secured creditor. For realty, the recording acts generally provide that protection. *See* D.C.Code §§ 45–801 *et seq.* (1990). For personal property, under the Code scheme, the filing of a financing statement fulfills the same function and is the normal means of perfection.[11]

In both realty and personalty, the most common exception to the recordation or filing requirement is where the possession of the property in question is held not by the property owner but by another, thus putting the world on notice of possible imperfections in absolute ownership. *See, e.g., Clay Properties, supra,* 604 A.2d at 895–97. Thus it is that the Code continues to recognize possession as an alternative means of perfection with respect to certain designated kinds of collateral. Most obvious is where the property itself, in its actual corporeal sense, is taken into the creditor's possession, the classic pledge of "goods," as to a pawnbroker. But beyond that, perfection by possession is permitted only where it is widely recognized that the underlying property which is of value, whether corporeal or intangible, is conceptually entirely embodied in the written item in question, so that the possession of the paper can be fairly deemed to be possession of the actual property insofar as notice to third parties is concerned. As a leading treatise has put it:

> Because most lending is now done against collateral, such as inventory or equipment, which the debtor must possess, the pledge is limited to a few commercial contexts.... Since the creditor's possession (and the debtor's lack of it) is designed to put third parties on notice, the collateral must be the type that one can see, touch, and move. The collateral must have a physical embodiment recognizable as exclusively representing the right.

2 WHITE AND SUMMERS, *supra*, § 24–12, at 348. Thus it is that money, negotiable instruments and the like such as checks

---

**11.** D.C.Code § 28:9–302 (1991) provides that "a financing statement must be filed to perfect all security interests except the following ... [listing exceptions]."

and promissory notes, stocks and bonds, and negotiable documents readily fall within that category. Letters of credit and chattel paper likewise are widely recognized as embodying the right. But where the issue is at all close, the call should be in favor of requiring the simple and easily accomplished step of filing a financing statement. "When there is such doubt in the business world about what if anything represents a property interest, possession is not a reliable method of perfection." *Id.*

With cooperative apartments, the fact is that the ostensible owner continues to occupy the true thing of value, the apartment itself,[12] and those dealing with him have no ready way to know about the existence of the "secret lien" of the creditor who possesses not the thing of value but simply a writing relating thereto.[13] Retention of possession of the right of residence in the cooperative apartment, independent of possession of the proprietary lease, suggests, however inaccurately, that the debtor still possesses the property interest free of encumbrances. Stated more generally, "[t]he problem with retention of possession—ostensible ownership—ultimately seems to return to a legal rule governing information as a means of reducing uncertainty. Creditors are worried about a debtor's trying to get credit by passing off things as his that he really does not own." Douglas G. Baird and Thomas H. Jackson, *Information, Uncertainty, and the Transfer of Property*, 13 J. LEGAL STUD. 299 (1984). The absence of any change of possession of the property itself thus fails to give the notice to the world upon which the concept of perfection by possession is based.[14]

Under D.C.Code § 45–801 (1990), a deed conveying an interest in real property is not effective against creditors or bona fide purchasers without notice of the deed unless it is recorded. Because leases for more than one year cannot be created "except by deed," D.C.Code § 45–306 (1990), such leases and interests therein must be recorded to be valid as against a creditor or subsequent bona fide purchaser without notice. By generally requiring recordation in order to protect a leasehold interest held by one out of possession, these provisions enable parties to avoid the unfortunate consequences that can flow from the fact that physical possession of the premises of a leasehold may incorrectly lead third parties to believe that the possessor has a transferable interest in the premises. Thus, possession of the lease document without public recordation or possession of the premises may not adequately protect one's rights in the leasehold.[15] The obvious analogy to

---

**12.** *See* 15A AM.JUR.2D *Condominiums and Co-operative Apartments, supra,* § 62, at 894 (primary interest of every shareholder in a cooperative apartment is the long term proprietary lease and the stock is incidental to such purpose); *see also Sinnissippi Apartments, Inc. v. Hubbard,* 114 Ill.App.3d 151, 69 Ill.Dec. 889, 893, 448 N.E.2d 607, 611 (1983) (same).

**13.** In this regard, the proprietary lease document resembles a document of title more than a security. *See* D.C.Code §§ 28:9–105(f), 28:1–201(15) (1991). However, only *negotiable* documents of title are subject to perfection by possession, a characteristic that cannot be ascribed to the proprietary lease document. *See id.* § 28:7–104. See also note 9, *supra.* One of the changes in the UCC from pre-existing law was to eliminate the pre-Code priority for pledged nonnegotiable documents of title. 1 GILMORE *supra,* § 14.1, at 439.

**14.** Of course, it is irrelevant whether the subsequent party asserting priority in fact made any investigation into the existence of prior liens. *See* D.C.Code § 28:9–312(5) (1991); D.C.Code § 45–801 (1990). Indeed, the UCC, as amended, gives priority to judgment lien creditors even if they have actual knowledge of the prior security interest. *See* D.C.Code § 28:9–301(1)(b) (1991); 2 WHITE AND SUMMERS, *supra,* § 26–2, at 493 & n. 1.

**15.** In many ways, indeed, the "pledge" of a proprietary lease, especially when not accompanied by any independent documentary evidence of the membership interest, bears close resemblance to a leasehold mortgage. It has never been suggested, to our knowledge, that taking possession of the lease document by the mortgagee constitutes any notice to subsequent parties. We note also, although the point is not raised before us, that the definition of "instrument" in the Uniform Commercial Code excludes a "lease" from the category of personal property, akin to negotiable instruments and securities, that are writings of a type which are "in ordinary course of business transferred by delivery." D.C.Code § 28:9–105(i) (1991).

The recognition of the mixed nature of the ownership of a cooperative apartment has led some lenders to adopt the so-called "belt and suspenders" practice of complying with both

**140**

real property recordation is the filing of the financing statement.[16]

**D**

First Savings seeks to draw support from the New York case of *State Tax Comm'n v. Shor*, 43 N.Y.2d 151, 400 N.Y.S.2d 805, 371 N.E.2d 523 (1977). In that case, the court held that the cooperative apartment interest was personalty and not realty and therefore denied priority to a judgment creditor who had not executed on the interest.[17] In rejecting a prior lower court case to the contrary, the court relied upon a 1971 amendment to the New York banking law, which the court construed as indicating a legislative intention that lenders in possession of cooperative documents be "secure from claims of subsequent creditors without any filing or recording of the security interest." *Id.* 400 N.Y.S.2d at 808, 371 N.E.2d at 527.[18] We have no comparable law in the District. Furthermore, in *Shor*, the cooperative issued stock certificates to its members, a form of traditionally pledgeable personal property, while here the proprietary lease document, although referring to the lessee as the "Member," does not in any way purport to be evidence of the membership interest itself in the corporation. It is also worth noting that in

1988, the New York General Assembly changed its law to require that a lender with a security interest in a cooperative apartment file a financing statement in order to perfect the interest. See note 8 *supra.*

Accordingly, we conclude that the trial court was correct in rejecting First Savings' argument that it had perfected its security interest in the Tsakos' cooperative apartment rights by taking possession of the Propriety Lease document as a "security." [19]

*Affirmed.*

---

personal and real property perfection rules. *See* Note, *Legal Characterization of the Individual's Interest in a Cooperative Apartment: Realty or Personalty?*, 73 COLUM.L.REV. 250, 274 (1973) (hereafter "Note").

**16.** The fact that Watergate West maintains an optional registry of pledged proprietary leases is not germane. No such method of perfection is recognized in the UCC and indeed, this older method of perfecting the assignment of accounts receivable was rejected by the UCC drafters. 1 GILMORE, *supra*, § 8.7, at 275. Moreover, the existence of such a registry seems designed simply to ensure that lenders with security interests in proprietary leases will receive notice from Watergate West of defaults by members in their obligations under the leases.

**17.** Under New York law, a judgment creditor merely by docketing the judgment obtains a lien upon all real property of the judgment debtor, including "chattels real" such as ordinary leaseholds. *Id.* 400 N.Y.S.2d at 806, 371 N.E.2d at 524.

**18.** *Superior Financial Corp. v. Haskell,* 556 F.Supp. 199 (S.D.N.Y.1983), also cited by First

Savings, simply follows *Shor* in reaching its result. Further, the assumption that any lender conditioning its loan on a security interest in the cooperative apartment will always seek to see the stock certificate and proprietary lease, even if tenable under then-settled New York law, pays short shrift to the interests of unsecured lenders, also a concern of the notice system. *See* Julian B. McDonnell, *A Reevaluation of Public Notice under Article 9 of the Uniform Commercial Code,* 1A U.C.C.Serv. (MB) § 6C.07[3], at 6C–121 (1980); *see generally* Douglas G. Baird, *Notice Filing and the Problem of Ostensible Ownership,* 12 J. LEGAL STUD. 53 (1983).

**19.** We see no basis to make our ruling prospective only, as First Savings urges. *See Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971). We do not here overturn any existing law, and the difficulties involved in cooperative apartment lending have been well recognized. *See, e.g.,* ROHAN AND RESKIN, *supra* note 8, at §§ 5A.01 *et seq.;* Note, *supra* note 15, 73 COLUM.L.REV. at 272–79.