WATERGATE WEST, INC., Appellant,

v.

BARCLAYS BANK, S.A., Appellee.

Nos. 99–CV–170, 99–CV–262.

District of Columbia Court of Appeals.

Argued June 29, 2000.
Decided Sept. 14, 2000.

Frederic W. Schwartz, Jr., Washington, DC, for appellant.

Geoffrey Judd Vitt, with whom Eric D. Jones, Norwich, VT, was on the brief, for appellee.

Before STEADMAN, GLICKMAN, and WASHINGTON, Associate Judges.

STEADMAN, Associate Judge:

This is the third and hopefully final appeal adjunct to litigation arising out of a long-ago defaulted European loan. It pits Watergate West, Inc., a cooperative corporation ("Watergate"), against Barclays Bank, S.A. ("Barclays"). Barclays, which made the loan, is a judgment creditor of a married couple, Basil and Laura Tsakos ("Tsakos"), who guaranteed the loan. Barclays is seeking to satisfy the judgment out of the proceeds of the resale of a leasehold interest in a cooperative apartment formerly held by the Tsakos in the Watergate complex. Watergate is seeking to recover unpaid assessments and other charges due on the apartment prior to the resale.

We hold that Watergate, in a position similar to a mortgagee in possession, had a duty to rent the apartment prior to its eventual resale, but with the right to first apply such rental income to amounts owed to it. We thus reverse the trial court's award of damages to Barclays, which did not recognize that right of Watergate. We further hold that, to the extent that such actual or imputed rental income would be insufficient to satisfy the applicable amounts owed to Watergate, the trial court correctly ruled that principles of *res judicata*, stemming from the condemnation action brought by Barclays in which Watergate had intervened, barred Watergate from now asserting an interest in the proceeds of the resale superior to that of Barclays.

## I. Facts

The facts of this case are complex, and involve several underlying lawsuits, which

have come before this court on prior occasions. *See Barclays Bank, S.A. v. Tsakos,* 543 A.2d 802 (D.C.1988); *First Savings Bank of Virginia v. Barclays Bank, S.A.,* 618 A.2d 134, 135 (D.C.1992). While much of the factual background is given in those prior opinions, we will set forth here a sufficient recitation to illuminate the present dispute. Watergate, the appellant, is a cooperative corporation formed under the laws of Delaware that owns a cooperative apartment building in the District of Columbia. All the units in the Watergate are owned by the cooperative corporation. Each resident is the lessee under a proprietary lease which vests in the owner the right to live in a particular apartment in the Watergate for a renewable ninety-nine year term. All owners of proprietary leases for the cooperative apartments become members of the cooperative. Under both the proprietary lease and the by-laws of the corporation, such members are required to pay a pro rata share of monthly cooperative fees and assessments for "capital items, principal and interest payments on mortgages, deeds of trust, or any other indebtedness, ground lease rental, and for operating items, such as taxes, insurance, repairs, betterments and operating expenses, and other incidental or related expenses."

The Tsakos are the former owners of the proprietary lease for Unit 602 in the Watergate complex. The appellee, Barclays, is a French bank[1] that provided a loan of 2.5 million Swiss francs to the Tsakos' son, secured by separate guarantees executed by both Mr. and Mrs. Tsakos. When the son defaulted on the loan, Barclays brought actions against the Tsakos in the courts of France, Switzerland, and the District of Columbia. On May 19, 1986, out of concern that the Tsakos were attempting to move their assets beyond the reach of the foreign courts, Barclays obtained a prejudgment attachment on the Tsakos' interest in Unit 602 of the Water-

gate apartment—the Tsakos' only known asset in the United States.

The Tsakos moved to dismiss the complaint and quash the attachment. At that time, none of the interested parties-including Watergate-disputed that the Tsakos' cooperative interest had been attached. The only dispute focused on whether the District of Columbia had personal jurisdiction, and if so whether the forum was convenient for the action.

On October 9, 1986 the trial court dismissed Barclays' complaint. Barclays appealed, and on November 13, 1986, this court granted Barclays' motion for an emergency stay and enjoined the sale or other disposition of the Tsakos' apartment pending appeal. However, the Tsakos had failed to make monthly cooperative fee and assessment payments to Watergate since February, 1986, in violation of the proprietary lease. Under such circumstances, the lease (and the by-laws) provided a specific remedy:

> In the event of default by the Member in the payment of any ... charges or assessments required to be paid under this agreement ... the Cooperative, by direction of its Board of Directors, may terminate this agreement on twenty days' written notice to the Member. Unless such default is cured within the twenty-day notice period aforesaid, the Cooperative may immediately or at any time thereafter declare this agreement terminated, and offer for sale a substitute agreement for the apartment or unit at a price determined by the Board of Directors to be its fair market value. Upon sale of the substitute agreement, the Cooperative shall pay to the Member the amount received less any unpaid assessments or charges accrued to the date of disposition, the expenses of sale (which shall include a reasonable brokerage commission) and the estimated cost for placing the apartment covered by the agreement in suitable condition for a new occupant.

1. Barclays is a wholly owned subsidiary of the English bank of the same name.

Pursuant to this provision, on November 24, 1986, the Board of Directors of Watergate voted to terminate the Tsakos' interest in Unit 602. On March 30, 1987, Watergate informed the Tsakos' lawyer of the termination.[2]

On September 1, 1987, Watergate filed a motion to intervene on Barclays' appeal. In its motion, Watergate asserted that it had terminated the Tsakos' lease, and therefore, the Tsakos no longer had an interest in the cooperative although they continued to retain an interest in the proceeds of Unit 602's sale. Watergate also represented in its motion that it possessed the interest in Unit 602 and that the court order granting the stay prohibited Watergate from selling the Tsakos' interest.

On October 8, 1987, this court granted Watergate's motion to intervene. Three days later, Watergate entered into a contract with unrelated third parties to rent Unit 602 for an amount equivalent to the monthly cooperative fees and assessments associated with that unit.[3] Shortly thereafter, Watergate moved to strike its motion to intervene on the grounds that its "sole purpose in intervening was to request permission of the Court to sell the proprietary interest in apartment 602 of Watergate West as the monthly assessment for the premises was accruing although the apartment was unoccupied. The sale of the apartment, the procedure under these circumstances, had been enjoined by this Court. During the interim, however, arrangements were made to rent the apartment until the Court's stay was lifted, and the intervenor no longer has a basis to request relief from this Court." Since Watergate's basis for requesting relief was negated, this court granted the motion and permitted it to withdraw the intervention.

On June 3, 1988, this court held that the Superior Court had *quasi in rem* jurisdiction to maintain a prejudgment attachment on that property pending the outcome of Barclays' suit against the Tsakos in the French courts. *See Barclays Bank, S.A. v. Tsakos,* 543 A.2d 802 (D.C.1988). Meanwhile, a French court had rendered a verdict in favor of Barclays in the amount of 2.5 million francs against the Tsakos. Barclays then sought to enforce that judgment in its action before the Superior Court through a judgment of condemnation of the Tsakos' apartment. At that point, First Savings Bank of Virginia ("First Savings") moved to intervene in Barclays' suit against the Tsakos, claiming that it had perfected a security interest in the Tsakos' apartment by taking possession of the Tsakos' proprietary lease docu-

---

**2.** The trial court considered this later date as the effective date of termination, without objection or appeal.

**3.** The agreement was with Dr. and Mrs. Esfandiary (Esfandiarys), whereby the rent paid by the Esfandiarys for Unit 602, including its parking space, was equal to the monthly cooperative fees for the apartment. In the fall of 1987, the monthly cooperative fees were approximately $1,700. As an additional fee for renting the apartment, Watergate required the Esfandiarys to pay the Tsakos' delinquent cooperative fees, as well as attorney's fees and other costs associated with the transaction. The amount of the fees and other costs was approximately $43,000. This amount however er was to be applied toward the Esfandiary's eventual purchase of a substitute proprietary lease, or failing that, returned to them.

From July to December of 1988, counsel for Barclays sent four letters to counsel for Watergate regarding the rental of Unit 602 to the Esfandiarys. In the letters, Barclays expressed concern over the rental of the apartment at a price below fair market value. Barclays specifically requested information on why the rental price was so low, and asked that Watergate re-rent the apartment at fair market value. No evidence exists that counsel for Watergate ever responded to these repeated requests for information. The Esfandiarys never completed the purchase of a substitute lease for Unit 602 and in September 1990, they moved to another unit in the Watergate. The unit was not rented from the time the Esfandiarys moved out in 1990, until it was purchased by a third party, not involved in this suit, in 1994. Between 1990 and 1994, Barclays wrote several letters to Watergate concerning the vacancy of the apartment and requested that efforts be made to sell a substitute lease for the unit.

ment, and that its interest had a priority above Barclays. The trial court granted First Savings' motion to intervene on the limited basis of determining the priority of the competing bank liens. On April 27, 1989, the trial court ordered that the French judgment be enforced in this jurisdiction, gave judgment for Barclays for approximately $1.6 million, and entered an order of condemnation of the Tsakos' apartment.[4]

On May 30, 1989, Watergate again moved to intervene, requesting reconsideration of the Superior Court's April 27, 1989 order,[5] and seeking damages for wrongful attachment. In that motion, Watergate argued that Barclays' attachment was not valid because it sought attachment of the physical structure of Unit 602, which was owned by Watergate, rather than the cooperative interest owned by the Tsakos. Watergate asserted that "the defendants' proprietary lease and the corporation shares associated with it were cancelled ... and the lease was terminated." In support of its intervention, Watergate pointed again to the argument that it had previously made during its 1987 intervention motion, i.e., that it had cancelled the Tsakos' interest and taken possession of the property and therefore had standing to intervene. The trial court, noting explicitly "that Watergate had a previous opportunity to intervene in this action, from which it withdrew," granted Watergate's motion "to intervene ... as a party defendant in any proceedings involving the validity and priority of liens against the subject property and for the disposition of the property attached, whether by judgment of condemnation or otherwise." The court, however, denied Watergate's motion for reconsideration of the enforcement order and its motion for damages for wrongful attachment.

Watergate filed a motion to reconsider this latter order, arguing, in relevant part, that it could not effectively assert its claim

of priority over Barclays. In its motion, Watergate asserted that "while [the court's order] allowed Watergate to intervene in any proceeding to determine the validity and priority of liens against the Tsakos' interest in Unit 602, it also held that the attachment was valid and therefore Barclays Bank has the lien with the highest priority. Under these circumstances, the debt owed to the lender and Watergate West cannot be satisfied." Almost one year later on June 15, 1990 the trial court denied Watergate's motion to reconsider the intervention order. On the same date, the court held that (1) Barclays had priority over First Savings Bank of Virginia, (2) Barclays was "authorized to take all steps necessary to recover $1,620,138.10 through the sale of the interest of Basil and Laura Tsakos in Unit 602," and (3) Watergate "shall cooperate with Barclays in this effort."

Both Watergate and First Savings appealed. Watergate argued that Barclays' writ of attachment "wrongfully attempted to attach the Tsakos' apartment, which was real estate owned by Watergate West, rather than the Tsakos' interest in the apartment," and supported the argument of its co-appellant that First Savings had priority over Barclays' interest. *First Savings Bank of Virginia v. Barclays Bank, S.A.*, 618 A.2d 134, 135 (D.C.1992). However, we affirmed the trial court's decision. *See id.* at 140. With respect to Watergate's appeal, we held that Watergate's request for relief was untimely because the writ of attachment gave Watergate an adequate opportunity to challenge the subject of the writ. We also noted that "[t]he record shows that Watergate West's Executive Board understood that Barclays had attached the Tsakos' interest in their apartment...." *Id.* at 135–136, n. 5. Finally, we held that Watergate had no standing to assert that First Savings' interest had priority over that of Barclays'.

---

4. This order did not specifically rule on the priority of Barclays' lien.

5. Watergate did not become aware of the order until May 23, 1989.

*Id.* at 136, n. 7.[6] On appeal, Watergate did not brief its argument that the trial court effectively precluded it from asserting a priority over Barclays' lien, and did not argue that, even if Barclays' writ of attachment was valid, under the terms of the lease agreement Watergate had priority over Barclays at least to the extent of unpaid fees and assessments.[7]

Two years later, in June of 1994, a substitute proprietary lease for Unit 602 was finally executed—that is, the apartment was finally "sold." After the deduction of the required expenses of settlement, the sale of the proprietary lease for Unit 602 and parking netted $510,014.88. At the sale, the buyer tendered an additional $1,097.07 representing the monthly fees and assessments for the remainder of the month of June 1994, for a total sales price of $511,111.95. Watergate endorsed the check over to Barclays, where it was promptly placed in an escrow account pending resolution of the parties' rights.

The parties, however, could not come to an amicable agreement about the distribution of those sale proceeds. On April 15, 1996, Watergate filed a complaint with the Superior Court. In its complaint, Watergate made four arguments: (1) because the Tsakos' interest in the cooperative apartment, which was attached by Barclays on May 19, 1986, was terminated by Watergate in 1987, Barclays was entitled to none of the proceeds of the sale of Unit 602, as the interest it obtained through the attachment was terminated in 1987 as well;

(2) First Virginia Bank, as the successor to First Savings, was entitled to the excess proceeds of the sale of the substitute proprietary lease; (3) Watergate was entitled to unpaid assessments and charges associated with Unit 602 prior to the sale of a substitute proprietary lease; and (4) if Barclays' interest was not terminated Watergate was entitled to unpaid assessments and charges associated with Unit 602 prior to the sale of the substitute proprietary lease, because Barclays could not "acquire any right or interest greater than that held by Mr. and Mrs. Tsakos." [8]

Barclays filed a counterclaim seeking damages from Watergate. Barclays alleged that Watergate's refusal to cooperate in the sale of the apartment, conduct in damaging the apartment,[9] and failure to rent the apartment in a commercially reasonable manner harmed Barclays' interest in the apartment. Barclays also filed a motion for judgment on the pleadings, arguing that Watergate's action should be dismissed on the alternative grounds of *res judicata*, statute of limitations, and lack of standing.

The trial court granted Barclays' motion to dismiss, ruling that Watergate's claims were precluded by *res judicata*.[10] Watergate's cross-motion to dismiss Barclays' counterclaims was denied, and those claims proceeded to a bench trial. After trial, the court made written findings of fact, upon which it granted judgment in favor of Barclays. Specifically the court found that Watergate violated the court's

---

6. The bulk of the opinion addressed and upheld Barclays' priority over the claim of First Savings.

7. Any intimation to this effect contained in Watergate's petition for rehearing would come too late. *Cf. Johnson v. District of Columbia,* 728 A.2d 70, 75 n. 1 (D.C.1999) (holding issues raised for the first time in reply brief are untimely).

8. It seems that Watergate's last two arguments differed only on the theory of recovery advanced. While both theories relied on the lease agreement and membership by-laws, it appears that one theory (the third argument) advanced a traditional lien-holder scenario, .

while the final argument sought preemptively to carve out Watergate's right to the proceeds of the sale from what Barclays had attached.

9. Barclays asserted that the condition of the apartment had deteriorated not only through the passage of time, but also because the apartment was used to store construction materials that caused damage.

10. The trial court ruled that Watergate had previously litigated the same or similar claims by raising "the issues that the attachment was invalid, that it had foreclosed on the Tsakos' interest, and that Barclays was entitled to none of the proceeds of the sale of Unit 602."

June 1990 order to cooperate in the sale, and that this violation gave rise to a civil cause of action. Moreover, the court found that Watergate owed Barclays a fiduciary duty to protect Barclays' interest in the property, and that Watergate breached this duty when it failed to rent the apartment at market value and allowed the apartment's condition to deteriorate through neglect and active misuse. Despite these findings, the court found that the amount of deterioration in the unit was irrelevant to the eventual sale, as the purchaser testified that her plans for renovation made the actual condition of the apartment moot.[11] Thus, the court found no damages based on an allegedly low selling price. The court, however, awarded $173,100 to Barclays, an amount that reflected rental income, actual and potential, from the time of the termination of the Tsakos' lease up to the sale of the apartment in 1994.[12]

On appeal, Watergate seeks reversal of both the judgment on Barclays' counterclaims, and the trial court's dismissal of its claims against Barclays. For the reasons explained below, we reverse the award of damages to Barclays, and affirm the dismissal of Watergate's complaint.

## II. Analysis

### A. Relationship of the Parties

In order to understand the respective rights and duties of the parties, we first examine the proprietary lease document and the corporation's by-laws themselves. Ordinarily under a lease arrangement, upon default by the lessee (particularly in the case of nonpayment of rent), the lessor may simply terminate the leasehold outright, legally resume possession of the premises, and thereafter deal with the property as it wishes. *See* D.C.Code § 45–2551(a) & (b) (1998). However, the proprietary lease and by-laws applicable here contain a provision governing default in payment of the fees and assessments which differs significantly from the traditional landlord/tenant remedy. Under the specific provision in the lease agreement, identical to a provision in the cooperative by-laws applicable to its members and quoted in full above, the Tsakos' failure to pay the required assessments gave Watergate the right to terminate the lease and then sell a "substitute agreement" for the property at "fair market value." The cooperative would then pay the Tsakos, as defaulting "members" (*i.e.,* the former owners of the proprietary lease), the proceeds of the sale less "any unpaid assessments or charges accrued to the date of disposition, the expenses of sale ... and the estimated cost for placing the apartment covered by the agreement in suitable condition for a new occupant."[13]

▮ The relationship between the Tsakos and Watergate, therefore, was quite

**11.** Barclays did not file a cross-appeal challenging this reasoning.

**12.** The court arrived at this figure by adding (1) the difference between the fair market rental value and the rent paid by the Esfandiarys for 36 months ($2,300 versus $1,700), (2) the actual rents received from the Esfandiarys and kept by Watergate ($1,700 per month for 36 months), and (3) the fair market rental value of the unit after the Esfandiarys departure (nine months of rental time at $2,300 per month, and an additional twenty-four months at $2,900 per month). Thus, the court's ruling reflects its opinion that Barclays' interest included the full fair market rental value of the property up to the time of the sale (whether actual or potential), as well as the sale proceeds.

**13.** The difference in treatment is, of course, justified by anti-forfeiture principles since, unlike the ordinary leasehold, the cooperative lessee pays a substantial initial purchase price.

By its terms, the lease purports only to authorize Watergate to sell a "substitute agreement" rather than the Tsakos' original interest evidenced by the lease, and there may be technical distinctions between a sale pursuant to the order of condemnation and a sale pursuant to the lease provision. However, any such differences do not appear relevant with respect to the duty to rent. Furthermore, while it is true that Watergate stresses that only the Tsakos' interest in the apartment was attached and that the Tsakos lease was terminated, these factors would be pertinent only to the *res judicata* issue and are not

analogous to that of a traditional mortgagor and mortgagee: upon default, Watergate could proceed against the Tsakos' interest and place the apartment on the open market to recover unpaid amounts due it (much like a foreclosure sale), with the balance of the sale proceeds to be paid over to Tsakos or other lienholders. *See generally* 55 Am. Jur.2d Mortgages, § 785 (1999); Richard R. Powell, 4 Powell on Real Property at § 37.41 (1999); George E. Osborne, Mortgages at §§ 337–344 (2nd ed.1970).

Applying the well-settled law of mortgages to the instant case, the overall relationship of the parties becomes clearer. Once the Tsakos defaulted, Watergate took possession of the apartment, in much the same way a mortgagee may take possession of mortgaged property upon default. *See* Powell, *supra*, at § 37.25. By the terms of the lease agreement and by-laws, Watergate was then required to sell a substitute lease for the apartment and satisfy the indebtedness owed to it, with any balance to be paid to the Tsakos or other lienholders in a manner analogous to a sale by a mortgagee in a foreclosure proceeding. *See* Powell, *supra*, at § 37.41. With this background, we turn to the specific issues on appeal.

### B. Duty to Rent

We first address Watergate's argument that the trial court erred in holding that it owed Barclays a "fiduciary duty" to rent

Unit 602 at fair market value until its eventual sale, for Barclays' sole benefit.[14] The court reasoned that because Watergate retained possession of the apartment, and because "Barclays [was] literally in the same position with Watergate that the Tsakos had been in with the Watergate ... Watergate had a duty to protect Barclays' interest in the property."[15] Continuing, the court concluded that "Watergate breached these duties when it failed to rent Unit 602 for the majority of the relevant time period [and] when it rented the apartment below fair market value to Esfandiarys for three years.... In light of the evidence presented and this Court's findings, the Court awards Barclays damages based on Watergate's breach of fiduciary duty in failing to rent Unit 602, in the amount of $173,100."

Even assuming Barclays was fully subrogated to the Tsakos' rights as shareholder-tenants (as the court presumably did, without discussion), we are aware of no authority to support the broad proposition that a cooperative corporation has some ill-defined common law fiduciary duty to rent an apartment for the sole benefit of a defaulting member prior to sale. It may well be that general principles of corporate-stockholder relationships impose some sort of duty *vis-a-vis* a member in good standing, *see Wisconsin Ave. Assoc., supra*, 441 A.2d at 963, but we do not think they translate well in determining the rights of the corporation *vis-a-vis* a mem-

controlling there, for the reasons set forth in Part II(D) *infra*.

14. It is important to keep in mind that, for purposes of this appeal, the trial court's judgment in favor of Barclays rests solely on Watergate's failure to rent Unit 602 at market value. Although the trial court also held that Watergate had failed to comply with a court order to facilitate the sale of the unit and damaged the unit by using it for storage, damages were derived only from the failure to properly rent the apartment. As previously mentioned, Barclays has not cross-appealed to assert any damage claims independent of the failure to rent at market value. *See supra* note 11 and accompanying text. Furthermore, we note that the trial court's calcula-

tions reveal that the damages awarded reflect the *entire* fair market rental value of the unit up to its sale (less several months of allowable down time).

15. In addressing the duty to rent, the trial court appeared to rely on the fiduciary relationship which exists "between a cooperative corporation and the shareholder-tenants of the corporation," citing *Wisconsin Ave. Assoc., Inc. v. 2720 Wisconsin Ave. Coop. Assoc., Inc.*, 441 A.2d 956, 963 (D.C.), *cert. denied*, 459 U.S. 827, 103 S.Ct. 62, 74 L.Ed.2d 64 (1982), and not to any significant degree on the court order requiring Watergate to cooperate in the sale.

ber who has defaulted in payment of assessments. Given the provision dealing with a member's default here, we think that the operative principles are better found in examining the rights and duties of a mortgagee in possession (as we have likened Watergate), which are well-settled and somewhat contrary to the trial court's ruling that Barclays was entitled to the entire rents and profits.

■■■ Generally, a mortgagee in possession does have a duty to seek to make the subject property productive, and a failure of that duty gives rise to liability. "It is well settled that equity imposes the duty upon a mortgagee in possession or a trustee not only to account for the rents and profits actually received, but also those that could have been received had there been an exercise of reasonable care and diligence." *Rogers v. Barton,* 386 Ill. 244, 53 N.E.2d 862, 868 (1944); *see also, e.g., Pollard v. American Freehold Land Mortgage Co. of London,* 139 Ala. 183, 35 So. 767, 772 (1903); *Johns v. Moore,* 168 Cal. App.2d 709, 336 P.2d 579, 581 (1959); *Conaway v. Thomas,* 101 Okla. 227, 224 P. 965, 966 (1924). "If [a mortgagee in possession] does not use reasonable diligence he is liable for the fair rental value." OSBORNE, *supra,* at § 167; *see also In re Union Meeting Ptnrs.,* 165 B.R. 553, 563 (Bankr.E.D.Pa.1994) ("[A] mortgagee in possession is held to a 'prudent owner' standard, and must manage the property in a reasonable and careful manner so as to keep it in a good state of preservation and productivity.") (quotation marks omitted).

■■■ However, along with the duty to rent is the mortgagee's right (indeed its obligation) to apply those proceeds first to the outstanding mortgage debt.

A mortgagee in possession is ordinarily required to account for the rents and profits he or she receives from the premises. Thus, a mortgagee in possession and entitled to the rents and profits of the mortgaged premises does not receive them absolutely in his or her own right and for his or her own profit, but must apply all the net rents and profits which he or she receives to the discharge of the mortgage debt, first to interest then to principal, in the absence of an assent by the parties concerned to a different appropriation. Accordingly, a mortgagee in possession is sometimes deemed a trustee. Upon redemption,[16] he or she must account for the rents and profits accruing during his or her occupancy, for the purpose of determining how much, if anything, is required in order to discharge the mortgage debt, the difference between the sums with which he or she is charged and the amount of his or her credits being deducted from or added to the mortgage debt, dependent upon whether the charges exceed the credits or the credits exceed the charges.

54A AM. JUR.2d MORTGAGES § 210 (1999) (footnotes omitted); *see, e.g., In re Dupell,* 235 B.R. 783, 792 (Bankr.E.D.Pa.1999) ("A mortgagee-in-possession becomes a quasi trustee to the mortgagor, operating the property not only to protect its own interest but also for the benefit of the mortgagor to pay off the debt."); *see also Fields v. Crowley,* 71 Or. 141, 142 P. 360, 361 (1914) ("The controlling idea of the statutes regulating the rights of judgment debtors and purchasers in and to the rents, profits, and possession of land from its sale on execution until its redemption, or until the expiration of the period of redemption, is that judgment creditors are entitled to, and should receive, no more than their debts, with interest and proper charges. Any deviation from this idea must entail injustice upon one or the other

---

**16.** Redemption *per se* is not the sole triggering event of the mortgagee's duty to account for proceeds of the property. A foreclosure sale likewise prompts this duty. *See* OSBORNE, *supra,* at § 166 ("an account can be called for only when the mortgagee enforces his debt by foreclosure or when the mortgagor seeks to pay it, either by voluntary agreement with the mortgagee or else *in an action in equity to redeem*").

of these classes.") (quotation marks omitted); POWELL, *supra*, at § 37.25 ("it can be generally stated that the mortgagee in possession has a duty of conduct to the mortgaged property akin to that of a provident owner and to use the net yield from the property for no other purpose than to credit it to the mortgagee's claim by way of equitable setoff").

Thus, although Watergate had a duty to rent Unit 602 at the fair market value until its sale, the rental proceeds were not Barclays' outright. Rather, Watergate had to apply those rents towards the balance of the fees and assessments due on the unit, including both those fees which the Tsakos had failed to pay during their membership, as well as those fees which accrued up until the final disposition of the apartment.[17] Barclays' right to the rental payments arose only after this outstanding balance was satisfied, and only to the extent those payments exceeded that amount. Therefore, the trial court was correct in holding that Watergate owed a duty to rent the unit, but erred in awarding Barclays the full fair market rental value of the same. Damages, could at most only have been for that portion of the potential fair market rental proceeds which would have exceeded the accrued

fees, assessments and costs due. We turn to that determination.

## C. Damages

■ According to the trial court's findings of fact, for which we find adequate support in the record,[18] the fair market rental value of Unit 602 totaled $173,100 from April, 1987 to the sale date of June, 1994.[19] The monthly fees and assessments for the unit totaled at least $1,700 per month, or $146,803 over the eighty-six plus months the apartment went unsold.[20]. Moreover, at the time their membership was terminated, the Tsakos already owed past-due fees and assessments, plus other costs, which the trial court found totaled $43,000. Thus, at the time of disposition, Watergate was owed at least $189,803 ($146,803 plus $43,000). Because the fair market rental value during the relevant period ($173,100) fell below the amount owed Watergate,[21] Barclays' claim for the surplus is moot. We therefore reverse the judgment in favor of Barclays on that claim.[22]

## D. *Res Judicata*

■ Finally, we consider Watergate's argument that the trial court erred

---

**17.** Under the lease and by-laws, fees and assessments accrue after default until a substitute lease is sold.

**18.** Thus, we reject Watergate's argument that the trial court's factual findings were clearly erroneous.

**19.** *See supra* note 12. The court found that the fair market rental value for the first forty-three months of the unit's availability was $2,300 per month, which rose to $2,900 per month for the remaining nine months the unit was on the market. The court determined that the unit could not have been rented for each and every month between Watergate's taking possession and the sale because of the normal delay in finding replacement tenants, and did not consider the rental value of the unit after an offer to purchase was made in January, 1994. We see no error in the court's reasoning in this regard, nor do the parties dispute it.

**20.** Watergate terminated Tsakos' membership on May 30, 1987. *See supra* note 2. Thus,

assessments accrued from April 1987 thru the sale date in mid-June 1994. At settlement, the purchaser tendered an additional $1,097 to cover the remaining balance of the June 1994 assessments. *See supra* Part I. Thus, the accrued and unpaid assessments of June 1994 equaled $603 ($1,700 less $1,097), which is added to the eighty-six full months' assessments stretching from April 1987 to May 1994 for a total of $146,803.

**21.** Although *res judicata* precludes Watergate from affirmatively recovering this deficiency from the proceeds of the sale of the substitute lease, *see infra*, the same principle cannot act to deprive Watergate of its right of offset to Barclays' claim for the actual and implied rents.

**22.** We need not reach Watergate's argument that Barclays' claim is barred by the statute of limitations.

in dismissing its claims, an issue now relevant only to the extent that amounts owed Watergate may exceed the fair rental value of the premises. The doctrine of *res judicata* has been recently recapitulated in this jurisdiction as follows:

> Under the doctrine of *res judicata* (claim preclusion), a final judgment on the merits of a claim bars relitigation in a subsequent proceeding of the same claim between the same parties or their privies. The doctrine operates to bar in the second action not only claims which were actually raised in the first, but also those arising out of the same transaction which could have been raised. If there is a common nucleus of facts, then the actions arise out of the same cause of action. The nature and scope of a cause of action is determined by the factual nucleus, not the theory on which a plaintiff relies. In determining whether the claim arises from the same factual nucleus, we consider the nature of the two actions, the facts necessary to prove each and whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage. In order for res judicata to apply, there must be identity of claims and identity of parties.

*Patton v. Klein,* 746 A.2d 866, 869–70 (D.C.1999) (internal quotation marks and citations omitted). Generally, an intervenor who actively participates in the litigation is subject to *res judicata* just as an initially named party. *See generally* 47 AM.JUR. 2d JUDGMENTS, § 659 (1999). Watergate's second intervention in the prior litigation at the trial level, therefore, is itself sufficient to preclude it from raising any claim that could have been raised previously.[23] *See Reichley v. Dist. of Columbia Dept. of Employment Services,* 531 A.2d 244, 254 n. 14 (1987); *see also Clark–Cowlitz Joint Operating Agency v. FERC,* 264 U.S.App.D.C. 58, 826 F.2d 1074, 1079 (1987) (en banc) (treating intervenors in prior litigation as parties for purposes of *res judicata* analysis), *cert. denied,* 485 U.S. 913, 108 S.Ct. 1088, 99 L.Ed.2d 247 (1988).

As evidenced by our *Patton* decision, quoted *supra,* whether an asserted claim could have been raised in the context of prior litigation between the parties is a broad inquiry which focuses not on the particular theories advanced, but rather on the subject matter of the prior case. Thus, a party is barred from initiating, in a subsequent suit, a claim based on facts "related in time, space, origin or motivation" to the original case. RESTATEMENT (SECOND) JUDGMENTS § 24(2) (1982); *see Leslie v. Laprade,* 726 A.2d 1228, 1231 (D.C.1999) (precluding litigation of the validity of a foreclosure sale which had been attacked in a previous suit, despite new theories of recovery advanced); *Henderson v. Snider Bros., Inc.,* 439 A.2d 481, 484–86 (D.C.1981) (en banc) (precluding claim of fraud in sale of real estate and dollar deficiency of promissory note under *res judicata* where validity of promissory notes had already been litigated).

In its present complaint, Watergate made four claims. Watergate has conceded on appeal, as it must, that its claims that Barclays' attachment was invalid and that First Savings' lien took priority over Barclays' lien were both fully resolved in the prior litigation. However, Watergate also asserted that it was "entitled to unpaid assessments and charges associated with Unit 602 and its parking space ac-

---

**23.** Given our holding, *infra,* we need not address the significance, if any, of Watergate's initial intervention and subsequent withdrawal. Moreover, we note that the relative lateness of Watergate's second intervention (after initial judgment was rendered by the trial court) does not prevent the application of *res judicata. See generally* 47 AM.JUR. 2d JUDGMENTS, § 659 (1999) ("even though a party is not allowed to intervene at the trial court level, it may still be bound by the judgment when it is allowed to fully participate at the appellate court level, including supplementing the record on appeal").

crued prior to the sale of a substitute proprietary lease," and that Barclays' interest did not include those fees and assessments. To support the validity of these latter claims, Watergate relied on the proprietary lease term regarding remedies upon default to which we have previously referred. In essence, then, Watergate's claim for declaratory judgment was an assertion of a priority interest over Barclays' claim, just as a mortgagee may assert a priority right to satisfy the outstanding debt on a foreclosed mortgage over the rights of other lien-holders. *See, e.g., Mennonite Bd. of Missions v. Adams,* 462 U.S. 791, 798, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983) ("[a] mortgagee's security interest generally has priority over subsequent claims or liens attaching to the property"); *see generally* 46 AM.JUR. 2d JUDGMENTS, § 404 (1999) ("The rights of a judgment creditor are inferior to the prior equitable rights of a mortgagee.").[24]

In the case before us, in which Barclays sought to enforce the foreign judgment against the Tsakos, both First Virginia and Watergate intervened. Initially, First Virginia entered the case to dispute Barclays' priority to the proceeds of the unit's sale. Watergate then interceded, disputing both the validity of the attachment and Barclays' priority as a creditor. Subsequently, as already stated above, Watergate was granted broad leave to intervene "as a party defendant in any proceedings involving the validity and priority of liens against the subject property and for the disposition of the property attached, whether by judgment of condemnation or otherwise." In its motion for reconsideration of that order granting Watergate's motion to intervene, Watergate argued to the trial court that it could no longer effectively claim its independent right to the unpaid fees and assessments. Although Watergate complained that it could no longer assert any priority above Barclays' lien, it made neither a proffer to the trial court regarding its potential rights nor a motion to test its doubts. The argument that such issues were precluded was rejected when the court denied Watergate's motion to reconsider the intervention order, and Watergate did not again raise the specific issue of its own priority, or the alleged ineffectiveness of the intervention order, to the trial court or in its brief on appeal.

■ The condemnation proceeding was clearly the judicial action intended to determine Barclays' exact interest *vis-a-vis* other claimants and Watergate intervened precisely to that end.[25] The struggle arose from the same "nucleus of facts" which gave rise to Watergate's present action—namely, the judicially enforced sale of a possessory interest in Unit 602—and Watergate is therefore precluded from now raising its claim of priority in the proceeds of that sale. *See Leslie, supra,* 726 A.2d at 1231. *Cf. Sandquist & Snow, Inc. v. Kellogg,* 101 Fla. 579, 136 So. 235, 237 (1931) (holding "the judgment as to the property owner and all parties who were made defendants and duly served with process in the lien foreclosure suit is *res judicata*" with regard to relevant priorities of claims); *Cona v. Gower,* 89 N.J.Super. 510, 215 A.2d 575, 578 (Ch. Div.1965) ("where a claim of priority is contested in an action, the alleged senior claimant is bound to disclose his title or interest by answer in the action"). Nothing in the court's grant of Watergate's motion to intervene precluded this issue; on the contrary, the sweeping language of the order reveals Watergate's ample opportunity and obligation to litigate in that action its rights to any proceeds of sale of the substitute lease.

---

**24.** Of course the priority of a mortgagee is not inviolate. *See, e.g.,* 55 AM.JUR. 2d MORTGAGES, § 334 (1999) ("Where the written instruments and conduct of the parties demonstrate that advances made under a mortgage are not obligatory, intervening lien creditors have been given priority over the mortgagee.").

**25.** We need not address the question of Watergate's rights had it not intervened.

The judgment in favor of Barclays on its counterclaim is reversed. The trial court's dismissal of Watergate's complaint is affirmed.

*So ordered.*